UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------X

Kendra HEWITT, Darlene WHALEY
and Ethel L. Wright

      Individually and as
      Class Representative,
      Plaintiff,

          v.

THE METROPOLITAN DISTRICT
COMMISSION,
Defendant.

-------------------------------------------------------X

Civil Action No. 3:01CV2037 (SRU)

Affidavit of Plaintiff, Linwood Braswell

STATE OF CONNECTICUT     )
                            ) ss.  East Hartford        December 9, 2002
COUNTY OF HARTFORD        )

### AFFIDAVIT OF LINWOOD BRASWELL

    I, the undersigned, having been duly sworn on my oath, do hereby depose and say:

    1.    That I am over eighteen (18) years of age and believe in the obligations of an oath.

    2.    I have been employed with The Metropolitan District Commission (the "MDC") since June 6, 1988 when I was hired as a Plant Operator in Training (Sewer Plant).

**EXHIBIT C**

3.      I make this affidavit in support of the Court's determination that it is appropriate for a class action to proceed, and as I believe a pattern and practice of racially discriminatory conduct has been undertaken by the management of The Metropolitan District Commission to accept, encourage or tolerate discriminatory treatment of minority employees working at The MDC.

4.      I state the following specifics from my personal experiences in the work environment:

a.      During my employment with the MDC, I have observed African-American/black and minority employees more commonly given poor performance evaluations than white employees.

b.      African-American/black employees have traditionally been given the worst work in the MDC and black and minority men are largely limited to or kept within the confines of the garbage plant or the sewer treatment plant, which present the least desirable working conditions for employees within the MDC's employment.

c.      I have observed the failure of the MDC to hire African-American/black and minority employees consistent with the workforce population.

d.    In my personal experience and from my observation of the treatment of African-American/black and white employees within the Trash to Energy Plant, I have observed African-American/black employees much more commonly being disciplined in terms of reprimands, suspensions and terminations, and demotions than any white employees.

e.    I have observed the undermining of personal and work reputation of African-American/black and minority employees by the MDC supervision.

f.    I have observed the failure of the MDC to promote African-American/black and minority individuals.

g.    The Metropolitan District Commission has failed to have an Ombudsman or Independent Affirmative Action Officer to receive confidential complaints of discrimination or to assist minority candidates seek and obtain promotion.

5.    Other minority employees at the MDC have expressed to me a fear of being involved in the present litigation because of past practice of MDC Management against MDC employees who raised litigation concerns.

6.      I have attempted to obtain legal counsel for my employment concerns in the past and discovered that it was virtually impossible to find legal counsel willing to take on an employment matter against the MDC because of its political connections and influence.

_____
Linwood Braswell

Subscribed and sworn to before me this 9th day of December, 2002.

_____
Robert W. Heagney
Commissioner of the Superior Court

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------X

Kendra HEWITT, Darlene WHALEY
and Ethel L. Wright

      Individually and as
      Class Representative,         Civil Action No. 3:01CV2037 (SRU)
      Plaintiff,
                                  Affidavit of Plaintiff, Daisy Chavez

             v.

THE METROPOLITAN DISTRICT
COMMISSION,
Defendant.

------------------------------------------------------------X

STATE OF CONNECTICUT    )
                        ) ss. East Hartford       February  , 2003
COUNTY OF HARTFORD    )

### AFFIDAVIT OF Daisy Chavez

    I, the undersigned, having been duly sworn on my oath, do hereby depose and say:

    1.      That I am over eighteen (18) years of age and believe in the obligations of an oath.

    2.      I have been employed with The Metropolitan District Commission (the "MDC") since July 12, 1976 when I was hired as a Junior Technician.

3.      I make this affidavit in support of the Court's determination that it is appropriate for a class action to proceed, and as I believe a pattern and practice of racially discriminatory conduct has been undertaken by the management of The Metropolitan District Commission to accept, encourage or tolerate discriminatory treatment of minority employees working at The MDC.

4.      I state the following specifics from my personal experiences in the work environment:

a.      I have observed the failure of the MDC to hire African-American/black and minority employees consistent with the workforce population.

b.      I have observed the undermining of personal and work reputation of African-American/black and minority employees by the MDC supervision.

c.      I have observed the failure of the MDC to promote African-American/black and minority individuals.

d.      The Metropolitan District Commission has failed to have an Ombudsman or Independent Affirmative Action Officer to receive

2

confidential complaints of discrimination or to assist minority candidates seek and obtain promotion.

e. The Affirmative Action Officer hired in 2002 has not been given a staff or a job description, does not have weight within the organization to bring about change, and has been prevented from speaking to Human Resource personnel who have conducted promotional qualification analysis and has been prevented from reviewing at least one promotion decision where a white employee was selected over a minority employee.

5. Since my hiring in July 1976, I was promoted to an Engineering Technician; a Drafter; a supervisor and an Administrator Grade 10, upgraded to an 11, reclassified to a 13 and upgraded in 1994 to a 14 (the highest grade for an Administrator). In each case, I had to fight for fair treatment to be promoted or upgraded.

6. In the summer of 1994, District Manager Anthony Milano had several conversations with me regarding my opportunities to advance and the importance to my career at the MDC of having a Master's degree and he strongly encouraged me to obtain

3

one.  These conversations told me that Mr. Milano was going to promote me to upper management if I was to obtain a graduate degree.

7.      In the summer of 1996, I graduated from the University of Hartford with a Master's Degree in Public Administration.  This took a great deal of personal and financial sacrifice to obtain while working full time.

8.      In the spring of 1997, Mr. Milano initiated a conversation with me where he offered to transfer me to Operations to be trained by the Director of Operations for an Assistant Director of Operations position, which was going to take 3 to 6 months to create. Mr. Milano asked me to think it over over the weekend and let him know on the following Monday morning.

9.      On that Monday morning, I briefly met with Mr. Milano and thanked him for the opportunity and agreed to the transfer as proposed by him.  Mr. Milano then asked me to work out a transfer date with Peg Roughan, Director of Personnel.

10.     At the end of May I met with Peg Roughan, to discuss Mr. Milano's request to work out a transfer date to Operations.  Ms. Roughan at first, acted as if she did not know what I was talking about.  So I said "perhaps I should not be speaking with you until Mr. Milano makes you aware of his request."  Then, Ms. Roughan admitted to having a

4

brief conversation with Mr. Milano.  Ms. Roughan then stated that she was going on vacation in a week or so and would meet again with me when she returned.  I then proposed a transfer date of July 1 - that would give everyone enough time - and the discussion ended with Ms. Roughan telling me that she would call upon her return to work after her vacation.

11.      In June, after Ms. Roughan returned from vacation, I called her on several occasions to confirm our discussions with regard to the July 1 transfer date.  We finally sat down to discuss what I thought was going to be the transfer date when Ms. Roughan informed me that Mr. Milano wanted to offer me a different position as the Administrator of Real Estate position (a lateral job with the same grade of pay). I informed Ms. Roughan that I was interested in Mr. Milano's original offer of the Assistant Director of Operations which represented an opportunity for growth and advancement, not a lateral position.  I then asked about the upper management promotional opportunities for the position Ms. Roughan offered.  Ms. Roughan did not know.

12.      A little time passed, and I heard nothing about either position.  In the fall, I met with Mr. Milano and Peg Roughan again, at their request.  At this meeting, Mr. Milano wanted to know if I would be interested in the Review Officer's position.  I asked again

about the promotional opportunities for an upper management position. I made great personal and financial sacrifices to obtain an M.P.A., at his request, with the understanding that he was going to assist in achieving my career goals of advancement to upper management within the MDC.

13.     On September 23, 1998, Mr. Milano called me to his office where Peg Roughan was also present and Mr. Milano directed that I be assigned to a non-existent special assignment in Engineering and Planning (E&P). I reported on Monday morning, September 28, 1998, to the Manager of Engineering Services. I was directed to sit at the very end of the Department with a table and chair, not even a desk, right out in the open walk way. I was extremely humiliated and embarrassed at being treated in this manner for no just cause, and with no explanation. I sat there doing menial and demeaning tasks, after spending 16+ years as the Administrator of a department which I had established; automating the MDC's service location records into a computerized system; forms and operational work orders, including attaching a cost accounting tracking process; plus hired and trained its staff of 19.

14.     I cannot fully describe how humiliated I felt each day I had to report to this department and a non-existing job. I continue to feel this way to this day. I tried to make

6

the best of the situation by learning as much as allowed in that Department, offering to help on any tasks or assignments, and enrolling in college courses to keep my mind occupied.

15.    During my special assignment in E&P, even after the humiliation on the day I arrived, I was denied a proper work area.  When the Manager of Engineering Services made a used cubicle available for me, I was moved into it.  Within two hours, thereafter, I was ordered to move back to the open area by Mr. Geldoff, to my further embarrassment. I was made to believe that Mr. Milano had chosen to place me in this demeaning situation, an employment purgatory, so that I would suffer the ongoing degradation of being without a real position, duties or responsibilities.

16.    Mr. Milano, on several occasions, discussed positions in the organization that he thought I might be interested in.  The very first being the transfer and then creation of the Assistant Director of Operations position to which I expressed an interest and accepted, however, it was never fulfilled.  This position has been renamed Assistant Manager of Operations, Grade EE18, and has been budgeted for (2001) although it has not been posted or offered since being created.  A proposed re-organization was started which changed the name of the Director of Operations position to Manager of Operations,

7

and creating the Assistant Director position which Mr. Milano had offered, to be renamed Assistant Manager.

17.     On May 25, 1999, I had a scheduled meeting with Mr. Milano to follow up on a conversation I had with him in December of 1998 regarding the retirement of the Manager of Water Supply and my interest in the position. At a prior meeting, Mr. Milano had stated he (Milano) would think about it and get back to me.

18.     At this meeting on May 25, 1999, Mr. Milano had Lebert Thomas, now the Manager of Engineering Services and my new supervisor, attend. At the beginning of the discussion, Mr. Milano rebuked me in an angry manner by saying that I should not come to see him any more. Any personnel issues should go directly to Peg Roughan, Director of Human Resources. Mr. Milano also stated that I was a letdown and disappointment to him. His monologue continued on for about 8+ minutes. During which time, he gave no explanation nor accepted any comments from me.

19.     I was very shocked, bewildered, embarrassed, and humiliated. At which time, I became emotional (crying). Milano offered me a Kleenex which was conveniently placed near where we were sitting. Mr. Milano never asked or provided me the opportunity to discuss the subject which was the purpose of the meeting.

8

20.    To remove myself from this, I started to apply for Management positions that were posted. For each and every position, I was either informed that I was not qualified or just was not sent notifications related to my application at all, even though I would call Personnel and request notifications.

21.    In June of 2000, Robert Moore was hired for the newly-created position of Chief Administrative Officer. Soon after, he called me and scheduled a luncheon meeting to discuss what positions I was interested in. However, as soon as those discussions started, Mr. Moore offered me positions which did not exist in the table of organization, but were things he was apparently looking to create. I tried to impress upon Mr. Moore that I would be a valuable addition to his immediate staff, that I had 25 years experience with the MDC and was a loyal and hard working employee. I inquired of Mr. Moore during their discussions if he was to have an assistant to which he responded that he would, but it would be an administrative level position, a much lower grade than the Grade 14 I currently had. However, around the first week in June of 2001, Mr. Moore named a white male grade 16 as his assistant. I was very skeptical of Mr. Moore's approach. I asked Mr. Moore for the Utility Services Manager's position (Grade 15) that had been vacant for about 1 ½ years in an area where I originally had worked for 7± years. Mr. Moore, at first,

9

said there was no such vacant position, but he would check with personnel. I continued to inquire every week or so, and finally, Mr. Moore said he was going to give me the position, but I might have to also perform the duties of Company Review Officer, which I agreed to do. The following day, I sent Mr. Moore an e-mail message to confirm his offer, and was shocked to receive a response contrary to our discussions.

22.    Mr. Milano removed me from my position in Treasury to clear the way for his long-time friend (who Mr. Milano had at the MDC as a consultant for quite some time) to obtain my ex-manager's position (Manager of Treasury) when he retired in May of 2000. This was $1\pm$ year after my transfer to a non-existing special assignment. Mr. Milano's acts denied me the opportunity to be in a position to become the Manager of Treasury. However, since removing me from the Administrator of Customer Service in the Treasury Department into the non-existent special assignment, employees in Customer Service were hand picked to be upgraded on an acting capacity to the next level. This created turmoil among the employees and the Union. In order to get rid of the problem they created, I was involuntarily placed in a lateral, vacant, permanent position. My position of Customer Service Administrator was never posted, but rather, outright given to a white, non-Hispanic individual.

10

23.     On April 2, 2001, the Manager of Utility Service position was posted and I was encouraged by Robert Moore to apply for it. However, I later found out that Mr. Moore had no intention of giving this position to me. The interviews were completed on Tuesday, June 26, 2001, and by Thursday, an email was sent out announcing the successful candidate. Normally, this process takes several weeks. At the interview I was informed the position would not be awarded until sometime in the middle of July. A non-Hispanic white male was awarded the position.

24.     Although I followed postings and diligently looked for opportunities, job postings for management positions were inconsistent. When Mr. Milano wants to award a position to an employee, he picks which jobs to post. Other positions are never posted, such as the position of Manager of Special Engineering Projects, where a white, non-Hispanic male received this job, which was recently awarded without being posted. When a management job is awarded without posting, qualified candidates like me are denied the opportunity to compete for the position, and is another means to carry out a glass ceiling against minority promotion.

25.     The inconsistent manner in which employees are promoted has long been a problem at MDC. I have become angry and frustrated by the manipulations. It is the

11

"Good Old Boys" network at its best.  No matter how hard you work and whatever your personal and professional credentials and accomplishments are, they do not matter. Credentials and accomplishments do not matter when it comes to achieving your career goals at the MDC.  When people such as Mr. Milano, Moore, Geldoff and others, continually strip you of your dignity and self-respect; take advantage of your knowledge and abilities while counting on your ignorance of the law and human rights; they play on your fear of retaliation and possible job loss to hold you down.

26.     During the recent few years, as I have attempted to gain a promotion, I have seen a pattern of the MDC not qualifying me and other minority employees for positions while qualifying white candidates who clearly failed to have minimum qualifications in education and experience.

27.     The MDC has a long-standing record of being under-represented with female and minority employees in upper management and has failed to resolve this under-representation despite this being a stated goal on the MDC Affirmative Action Plan.  The actions of the MDC are a violation of the Affirmative Action obligations of the MDC as a municipal entity.

12

28.     I have tried to address my personal and professional concerns at the MDC directly in a professional way, but to no avail.  I have currently been ordered into the existing vacant position of Administrator of Special Services, however, the Cross Connection duties and staff were removed from my responsibilities by Mr. Milano, Mr. Moore and Mr. Geldoff through the Director of Personnel, Peg Roughan, leaving just the clerical, non-managerial responsibilities.  As a result, these actions changed an established position's duties and responsibilities as stated in the Board-approved job description, without the required prior Board approval.  These tactics are constantly used against minority employees and creates a glass ceiling to stop their advancement in management.

29.     On July 9, 2001 I was given my performance review, which was discussed with Richard Newton.  Mr. Newton stated that I needed to get back to doing management work to receive above average rating at my job grade.  Prior to this review, I had received above average/average performance reviews including my many years as an Administrator.  I feel I am denied the opportunity to be productive and contributing to the MDC organization after so many years of hard work, dedication and loyalty.  This situation is very difficult for me.  Richard Newton stated that I do not belong in Engineering & Planning but he had no problem with me working for him.  This is a hell of a thing to say

13

to me after 25 years of service.  He also went on to say that the individual awarded the

Utility Manager position deserved it, he had put the time in.  I replied that only applies to

white men.  I also put in my time and waited for my supervisor's job, but I was abruptly

pulled out of the treasury position and then not even qualified for the interview.  The job

was awarded to a white   non-Hispanic, who was Mr. Milano's past friend.   Her

qualifications may be appropriate, but the manner in which she was given the job was not

appropriate.

30.        I have never in my life felt so embarrassed and humiliated, and Management

continues to assign me demeaning tasks, below my level of responsibilities.  They have

shoved me in a corner to forget about me perhaps hoping I would leave.  I am no longer

invited to attend staff meetings, and in other ways embarrassed and demeaned.

31.        One  particular  time,  Neal's  (Geldoff)  secretary  came  around  to  inform

everyone of a staff meeting.  So I asked if that meant me and she said I guess so.  As I

was walking in the conference room, Neal turned around and said "You are not needed,

you can leave now."  It's embarrassing to say that to an Administrator in front of staff.

32.        This whole matter has gotten me sick to the point of which I required surgery

for diverticulitis this fall.  As I has stood up for my rights and raised my concerns about

14

discriminatory conduct, I have faced a series of retaliatory actions, such as the lateral moves, the placement without a desk or real job, and the embarrassment by Mr. Milano, Neil Geldoff and others.

33.    The actions of the Respondent represent a pattern and practice of discrimination and retaliation against me as a Hispanic female and is part of an overall pattern and practice of MDC Management to discriminate against minority employees and to create a glass ceiling to prevent management level minority employees' advancement and to retaliate against them from achieving their full potential and career goals. I am the only Hispanic Administrator who has, through 25 years of hard work and dedication at the MDC, worked my way up the ranks to this level. However, I have not received a promotion since 1984 and have not had an upgrade since 1994. After obtaining the requested MPA, all doors to upper management positions have been closed. Opportunities for training and eventual promotions to management positions are only provided to the chosen.

34.  Further, by so discriminating against me and, given the pattern of Defendant's conduct as exhibited by its repeated treatment of me, Defendants did not adhere to the Affirmative Action requirements set forth as guidelines to govern its employment decisions and practices.

15

35.     Other minority employees at the MDC have expressed to me a fear of being involved in the present litigation because of past practice of MDC Management to retaliate and treat adversely MDC employees who raised concerns regarding the treatment of minorities.

36.     I have attempted to obtain legal counsel for my employment concerns in the past and discovered that it was virtually impossible to find legal counsel willing to take on an employment matter against the MDC because of its political connections and influence. I have been represented by Attorney Robert W. Heagney and have been very pleased with his diligence and professionalism in my representation.

26.     Recently, in response to the appearance of many minority employees before the MDC Board, an employment audit of MDC was retained by a local law firm politically connected to many MDC Board Members.  This audit reached the following conclusions:

    a.    "It is fair to say that MDC management over time since 1929 can be characterized as an "old boy" network, featuring almost exclusively white males who have succeeded one another, stayed with the organization during most of their adult, productive lives and hired and promoted persons who look like them.  Hiring by word-of-mouth to or from MDC Board members or administrators has long been the practice at MDC."

16

b.    "**2. <u>Affirmative Action Plan</u>**

**Also absent from the MDC's policy documentation is an updated Affirmative Action Plan**. The first MDC Affirmative Action plan we were able to located is dated 1996. The MDC has not sought to review or update its Affirmative Action Plan since 1997. It further has not utilized Affirmative Action goals in reviewing hiring and/or promotional practices. Other than having an outdated policy, the District has done little to ensure Affirmative Action goals are in keeping with the organization's legal obligations. Recall the MDC is, for purposes of the law a "municipality". This is significant. An Affirmative Action Policy, updated and correct, which includes the goals for the corporation provides a benchmark for reviewing hiring, retention and promotion practices of protected classes."

c.    "Our investigation revealed, however, that qualified minorities did not achieve supervisor status for many years. There is only one Black male in what the MDC describes as its "administrative/management positions". He replaced a "Director", but he is only a Manager."

d.    "The Manager of Finance (African-American male) perceives he is being treated differently by the COO than other managers in the MDC and in particular the Manager of Treasury. This perception translates into a belief that his position as being undermined by those above him who do not want to see him succeed. He complained of not being able to get a job revaluation through Human Resources in two years. He views the Chief Administrative Officer and the Manager of Treasury as undermining his credibility with both his employees and the Chief Executive Officer."

17

e.    "Employees feel they have nowhere to go if they are having a problem with a particular supervisor. Whether it be a claim of an unfair job assignment or harassment, there was no employee we interviewed who understood or believed that such a complaint <u>could</u>, or <u>would</u> be handled appropriately by Human Resources. Policies which would require an employee to secure a supervisor's permission before speaking to the Affirmative Action officer or to an MDC administrator only exacerbate this problem."

f.    "The recent hiring of an Affirmative Action Officer with no clearly defined role in the organization, does not eliminate the need for a Plan which can be supervised by the Affirmative Action Officer."

g.    "As matters currently stand, the Affirmative Action Officer has been provided with little guidance as to what his duties are and has met with some resistance concerning his authority in the organization and the scope of his involvement in practices heretofore reserved to personnel in the Human Resources area."

h.    **"The Human Resources Department also does not have any non-retaliatory complaint and investigation policy concerning complaints of discriminatory or other unfair treatment."**

i.    "What we discovered is that if an investigation takes place at all, it rarely includes acquiring a statement from the individual accused of the improper conduct until the investigation is complete and disciplinary action is decided. The nature of this process leads to a perception of unfair and skewed results and in altogether too many instances, to adversary actions."

18

j.      "There are, however, perceptions of unfair treatment
        among certain groups of employees who believe they
        have been victims of racial or other forms of
        discrimination at the District."


_____
Daisy Chavez

Subscribed and sworn to before me this        day of February, 2003.


_____
Robert W. Heagney
Commissioner of the Superior Court

19