

# LEVY & DRONEY, P.C.
ATTORNEYS & COUNSELLORS AT LAW

## *ATTORNEY-CLIENT PRIVILEGED COMMUNICATION*

# COMPLIANCE AUDIT OF EMPLOYMENT PRACTICES

# OF THE METROPOLITAN DISTRICT COMMISSION

# UNDERTAKEN BY LEGAL COUNSEL

## MARCH 15, 2002

**EXHIBIT D**

## TABLE OF CONTENTS

                                                                              Page

I.    INTRODUCTION AND OVERVIEW .................................... 1
      A.    Historical Perspective ...................................... 4
      B.    Pre-Interview Procedures ................................... 6
      C.    Rationale For The Compliance Audit ..................... 7

II.   METHODOLOGY EMPLOYED IN CONDUCTING COMPLIANCE AUDIT .... 8

III.  FINDINGS ....................................................... 11
      A.    An Overview ............................................. 11
      B.    Personnel ............................................... 13
      C.    Management ............................................. 19
      D.    Human Resources ........................................ 23
            1.    The Lack of An Effective Employee Relations
                  Program ........................................... 26
      E.    Employment Policies and Practices ...................... 27
            1.    The Employee Handbook ...................... 27
            2.    Affirmative Action Plan ...................... 28
            3.    Equal Employment Opportunity and
                  Discrimination Policies and Practices .......... 29
            4.    Internet and E-Mail ......................... 30
            5.    Violence in the Workplace ................... 30
      F.    Hiring And Selection Procedures ........................ 31
            1.    Lack of A Consistent Job Posting and Job
                  Selection Policy ................................ 31
            2.    Job Revaluation Process .................... 35
      G.    The Performance Review Process ......................... 36
      H.    Discipline Policies and Procedures ...................... 38
      I.    Training and Recruitment Policies ...................... 40

IV.   RECOMMENDATIONS ............................................. 42
      A.    Hiring a Director of Employee Relations ............... 42
      B.    The Creation of An Employee Handbook and Affirmative
            Action Plan ............................................. 44
      C.    The Implementation of a Non-Retaliatory Complaint
            Mechanism  .............................................. 45
      D.    Empower Affirmative Action Officer ..................... 46
      E.    The Creation Of An Affirmative Action Advisory Committee .. 47
      F.    The Undertaking Of A Job Classification Study ........... 47
      G.    The Restructuring Of The Performance Review System ....... 48
      H.    Revise The Hiring And Promotional Practices Of The MDC ... 48

-i-

    I.     Train, Train, Train . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    J.    The Immediate Implementation Of A Succession Plan In
        Engineering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    K.   Assemble A Multifunctional Team To Implement Safety And
        Security Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

# LEVY & DRONEY, P.C.
ATTORNEYS & COUNSELLORS AT LAW

_ATTORNEY-CLIENT PRIVILEGED COMMUNICATION_

March 15, 2002

Commissioner Marilyn Cohen
Chairperson
Blue Ribbon Committee
Metropolitan District
P.O. Box 800
555 Main Street
Hartford, CT 06142

Re:   **Compliance Audit of Employment Practices of The Metropolitan
District Commission Undertaken by Legal Counsel**

Dear Commissioner Cohen:

## I.    INTRODUCTION AND OVERVIEW

The Metropolitan District Commission ("MDC"), created by statute in 1929, is a

municipal corporation which provides drinking water, sewage collection and water

pollution control services, household hazardous waste collection services, and

geographic (mapping) information to eight member municipalities (Bloomfield, East

Hartford, Hartford, Newington, Rocky Hill, West Hartford, Wethersfield and Windsor)

and by contract to other towns in the region.  Pursuant to a contract with the

Connecticut Resources Recovery Authority, the MDC also is involved with trash-to-

energy transportation and processing operations.

The MDC functions as a public agency.  It employs almost 700 people.  The

policy making body of the MDC is a twenty-nine (29) member Board of

Commissioners, appointed, respectively, by the Town Councils of the eight member

POND VIEW CORPORATE CENTER, 74 BATTERSON PARK ROAD, FARMINGTON, CT 06032
MAILING ADDRESS: P.O. BOX 887, FARMINGTON, CT 06034-0887    (860) 676-3000  FAX (860) 676-3200
website www.ldlaw.com

Commissioner Marilyn Cohen
March 15, 2002
Page 2

communities, the Governor and the leaders of the General Assembly.

On October 1, 2001 some twenty (20) MDC employees complained to the MDC

Board about "forms of race discrimination and/or retaliation" experienced by them as

MDC employees. (A copy of the October 1, 2001 "charges sheet" is attached to this

document as Exhibit A).

Thereafter, the MDC Board decided to employ outside counsel to perform a

Compliance Audit.

MDC Counsel Bourke G. Spellacy of Updike, Kelly and Spellacy, P.C. then

contacted the law firm of Levy & Droney, P.C.   He spoke with Attorney John Rose,

Jr. and Attorney John F. Droney concerning employing Levy & Droney, P.C. to act as

attorneys for a special blue ribbon subcommittee of the MDC which was to conduct a

Compliance Audit of Employment Practices.  On October 24, 2001 Attorney Rose

wrote to Attorney Spellacy setting forth, in a fee and representation letter, the nature

of the firm's professional undertaking on behalf of the MDC.  (See Rose letter attached

hereto as Exhibit B).

On November 1, 2001, Commission Counsel Bourke G. Spellacy wrote to

Attorney John Rose, Jr. of Levy & Droney, P.C. specifically hiring Rose and that firm

to:

> investigate the MDC's compliance with its existing policy not to
> discriminate against any employee because of race, ancestry,
> color, creed, national origin, sex, age, physical disability,
> union membership or activity.  You will determine whether
> MDC is in compliance with its own discrimination policy as
> it relates to wages, hours and conditions of work.  In doing

Commissioner Marilyn Cohen
March 15, 2002
Page 3

so you shall review MDC promotional procedures, performance
evaluation procedures, wage rates, position classification, and
hiring procedures. Your investigation shall encompass all
District employees, management, union or nonunion and shall
include all MDC locations . . .

(A copy of the Spellacy letter is attached as <u>Exhibit C</u>).

In addition to Attorneys John Rose, Jr. and John F. Droney, the Levy & Droney,

P.C. firm assigned Lisa A. Zaccardelli, a principal experienced in employment

discrimination work, to the MDC project.

On or about November 10, 2001, the MDC, acting by its Chairman Anthony H.

Gallicchio, sent a letter to every employee of the Commission, to each Board member

and to MDC counsel expressing the Commission's concern about the complaints of

race discrimination, employment discrimination and retaliation. That letter (a copy of

which is attached hereto as <u>Exhibit D</u>) announced the MDC Board's decision to hire

Levy & Droney, P.C. to represent the Boards special Blue Ribbon Committee in

conducting a Compliance Audit of Employment Practices. The letter urged the MDC

employees and staff to cooperate with the attorneys and to treat the investigation as

highly confidential.

The MDC had established a Blue Ribbon Committee to review compliance with

state and federal law. That Committee has met with Attorneys Zaccardelli, Rose and

Droney concerning the investigation and it will receive the report of Levy & Droney,

P.C. as part and parcel of this Compliance Audit. The Blue Ribbon Committee

Commissioner Marilyn Cohen
March 15, 2002
Page 4

Members are,

      Marilyn F. Cohen (Chair)
      Dr. David G. Carter, Sr.
      Michael P. McGoldrick
      Trude H. Mero
      Beatriz Wardlaw
      Richard F. Waering

The MDC hired an experienced, former Commission on Human Rights and Opportunities employee as Affirmative Action Officer and has hired consultants to do diversity training for managers, supervisors and staff.

Between November 1, 2001 and February 28, 2002, Levy & Droney, P.C. lawyers performed the legal work described in Attorney Spellacy's engagement letter (Exhibit C).

A.    **Historical Perspective**

The rationale for the MDC Board's decision to investigate the MDC's policies and practices has several legal and practical underpinnings. Specifically, in a written memorandum of decision dated March 16, 2001, Chief United States District Court Judge Alfred V. Covello made certain findings concerning allegations of racism, employment discrimination and retaliation. See, Sharon Harper v. Metropolitan District Commission, Civil Action No: 3:96CV2171 (AVC). Harper was tried in the federal District Court in August 2000. The jury rendered a verdict against the MDC for 4.8 million dollars. Judge Covello rejected a portion of the claim relating to Title VII (disparate treatment). He found, however, that Harper had proved a claim of retaliation. The final verdict approved by the Court amounted to over $1.6 million.

Commissioner Marilyn Cohen
March 15, 2002
Page 5

Harper began in 1985. Judge Covello found that, in October 1986, Sharon
Harper and five other MDC employees organized into a group and delivered to the
MDC a report charging discrimination against the agency, including:

a.   selective training based on race;

b.   disparity in hiring based on race;

c.   selective use of seniority in promotion based on race;

d.   racial harassment;

e.   steering of minority employees into lower paying jobs;

f.   retaliation in the form of low work evaluations, verbal
     harassment, and reprimands for any employee who
     complained of these conditions;

g.   a lack of affirmative action at the MDC; and

h.   a lack of minority representation in top positions at the
     MDC.

These allegations, almost fifteen years old, closely resemble the race and
employment discrimination and retaliation claims contained in the October 1, 2001
"charge sheet" (See Exhibit A).

In addition, the MDC came under attack in *The Hartford Courant* when Stan
Simpson, a columnist for that newspaper, wrote two articles "back to back" (October
8, 2001 and October 15, 2001) about claims of discrimination by black employees and
others ". . .alleging discrimination in promotions and compensation, and retaliation."
(See Exhibits E and F).

Commissioner Marilyn Cohen
March 15, 2002
Page 6

On October 29, 2001, three African-American women employees brought a class action suit against the MDC, claiming discrimination in evaluations, compensation and promotion. They also contend that a pattern and practice of discrimination against African American employees exists. They are seeking substantial monetary damages and equitable and administrative relief.

The MDC has been and continues to be a Respondent in other, unrelated employment discrimination cases pending or brought to the State Commission on Human Rights and Opportunities (CHRO) and to the federal Equal Employment Opportunity Commission (EEOC). Cases have also been brought in State and Federal courts.

During the time frame 1999 to 2001, the MDC sustained monetary judgments (including the Harper case which has not yet resolved or paid) and settlements totaling in excess of $1.9 Million Dollars. Our review of pending claims and cases reflects a disturbing trend labeled by some as "Harperitis". Here, claimants continue to make outrageous settlement demands apparently believing that the precedent set by Harper entitles them to do so and/or that the MDC will pay them to avoid trial.

B.    **Pre-Interview Procedures**

Every person interviewed by an Attorney from Levy & Droney, P.C. was presented with the attached "Form For Advising All MDC Employee Interviewees", and told that Levy & Droney, P.C. and John Rose, Jr. and Lisa Zaccardelli are lawyers.

Commissioner Marilyn Cohen
March 15, 2002
Page 7

representing the MDC, investigating certain issues and/or complaints of employment

discrimination. (See Form for Advising All MDC Employee Interviewees, attached

hereto as <u>Exhibit G</u>).

C.    <u>Rationale For The Compliance Audit</u>

It is especially important that an employer committed to having rational, lawful

employment and labor relations policy, ensure that there is the most effective sharing

of information possible with the employer's most valuable resource  -  its employees.

We noted early in our review that many of the people we interviewed were

employees with twenty or more years tenure.  The quality and the capabilities of the

people we spoke to were also impressive.  During the entire investigative process,

we enjoyed the most courteous, open and expansive relations and conversations

with, quite literally, every one to whom we spoke.  Management and staff could not

have been more gracious and forthcoming.  The absolute candor that we experienced

was a testimonial to the MDC's having, over time, made many, wise employment and

promotional decisions.

**The importance of communication to all employees at every level about**

**matters important to them and to the company cannot be overstated.**  Documents

clearly spelling out the requirements of the law and the considerations and concerns

of the employer are essential.  Appropriate training provided to supervisors and to

line employees about the need for and the meaning of applicable law, policies and

practices is of paramount importance.

Commissioner Marilyn Cohen
March 15, 2002
Page 8

> The importance of conducting periodic and
> systematic human resources audits cannot
> be overemphasized. Through the audit process,
> an employer is able to identify those aspects of
> its human resources management that are in
> disarray, before the problems become the
> subject of a claim or lawsuit. It also allows the
> employer to take corrective action at its own
> pace, on its own terms, without meddling by or
> interference from plaintiff's attorneys or the
> courts. Because of these benefits, the wise
> employer will conduct systematic and periodic
> human resource audits, and treat them just as
> seriously as financial audits.

Mark A. Spognerdi, "Conducting a Human Resources Audit: A Primer", 23 Employee

Relations L. J., No. 1, Summer, 1997 (p. 122).

II.     **METHODOLOGY EMPLOYED IN CONDUCTING COMPLIANCE AUDIT**

In undertaking this Compliance Audit, it was necessary to review and analyze

the MDC's employment policies, procedures and practices, as well as all other

documents related to those practices in order to assess (1) the processes being

utilized; and (2) processes not in place to make employment decisions[1]. **It should be**

**noted at the outset that very fundamental policies, programs and documents**

**which govern the employment practices of most employers were not in place**

**and/or were not being utilized by the MDC.**

---

[1] The listing of all which was requested is extensive. By way of summary, we requested (1) recruitment practices; (2) employment policies; (3) a brief tour of the Human Resources Department; (4) The dissemination of policies and procedures; (5) the pre-hire process; (6) job descriptions; (7) the post-hire process; (8) testing policies including any and all drug testing policies; (9) placement decision policies; (10) promotion and transfer policies; (11) performance review policies; (12) any training/guidelines policies. We did not undertake a review of whether the job classifications are appropriate or whether wage and hour guidelines are being correctly applied.

Commissioner Marilyn Cohen
March 15, 2002
Page 9

Initially, Attorney Anthony Palermino (District Labor Counsel) provided us with a summary of all pending legal matters being handled by his office as of September 18, 2001, and November 20, 2001.[2] We received documentation re:

1.    Claims which have been filed against the District with the Commission on Human Rights and Opportunities ("CHRO");

2.    Cases which had been filed against the District in either State or Federal Court including recently tried, settled or dismissed cases;

3.    Arbitration matters;

4.    Matters pending before the State Board of Labor Relations.[3]

(Attorney Palermino provided us with copies of the Court and/or administrative agency filings for these legal matters which we also reviewed.[4])

We reviewed the following:

1.    Thirty (30) files comprising dismissed and/or settled CHRO and State and Federal cases;

2.    The complete Charter of the MDC.

3.    The MDC Annual Report for the Fiscal Year Ended December 31, 1999.

---

[2] The list was amended on at least one occasion to reflect updated information.

[3] As will be discussed in subsequent sections of this report, many of the recently filed CHRO claims concern employees who are represented by Attorney Robert Heagney including the most recently filed class action lawsuit. Mr. Heagney was Attorney Sharon Harper's attorney. Recall, however, that Ms. Harper did not prevail on her claim of racial termination, but rather that she was retaliated against because of her complaint.

[4] As requested by the Blue Ribbon Committee, we have provided a statistical breakdown, by complaint of those claims filed which allege race, sex, or other forms of discrimination.  (Attached hereto as Exhibit H).

Commissioner Marilyn Cohen
March 15, 2002
Page 10

4.     Documents describing the MDC's Administration; the MDC's Director and Committee listing; its holdings, including land, reservoirs, hydroelectric plants, water treatment plants, etc.

5.     The MDC's current Employee Handbook and draft Employment Manual.[5]

6.     Several policy directives which commented on certain employment policies and practices such as sexual harassment and drug and alcohol testing, including a recently proposed Violence in the Workplace Plan, a Draft Compensation Plan, and a Draft Succession Plan[6];

7.     The last known Affirmative Action Plan developed in 1996, and supplemented in 1997;

8.     The MDC's Strategic Plan for the year 2001;

9.     The hiring and promotional practices of the MDC including its performance review appraisal system, and job revaluation system;

10.     The three union contracts in place;

11.     The response of the MDC to the complaints presented to the Board on October 1, 2001, prepared by the Department of Human Resources.

12.     A breakdown of "Total Dollars Awarded to MBE/WBE Enterprises."

---

[5] The District's Employee Handbook is not a document which has been distributed to its employees or managers.

[6] These last three documents were all submitted in the January, 2002 time frame. (Attached hereto as Exhibit I).

Commissioner Marilyn Cohen
March 15, 2002
Page 18

Time and again employees reported frustration in not having an effective outlet to communicate their complaints.  Indeed, neither the employees nor the supervisors seem prepared or equipped to mediate disputes.  For the employee this leaves only one outlet - the filing of a union grievance - or, worse, a formal complaint with the CHRO or other state or federal agency, leading to expensive adversarial proceedings.

A second issue which must be addressed is the need for consistent practices in applying the policies and procedures of the MDC to its employees.  Employees who perceive unfair treatment point to such examples to argue they are being mistreated and that employment discrimination is the rationale.  In conducting this Compliance Audit of the MDC's employment practices, we learned, from our interviews with employees, that the inconsistent application of policies and procedures has encouraged employees to address issues through litigation[13].  For example, the job revaluation process is conducted inconsistently leading to the problems of employees waiting long periods of time.  In one particular instance, which is the current subject of litigation, the employee became frustrated with the length of time it took to review her job revaluation request.  Although the union contracts define the period of time the MDC has to act on a job revaluation, these deadlines are loosely followed and were not enforced by the Manager in Human

---

[13]  We do note that the current Affirmative Action Officer has increased his role in this area by actively soliciting employees who have complaints to address those complaints with him for purposes of investigation.

Commissioner Marilyn Cohen
March 15, 2002
Page 19

Resources. It is further unclear whether there are any guidelines upon which those charged with reviewing the reclassification request relies upon making his/her assessment that a job is misclassified or requires an upgrade.

## C.    Management

For purposes of this report, MDC "management" means District Administration, including the Chairman and senior directors and managers, from the Chief Executive Officer to the Managers of Treasury and Financial Control. We interviewed nine of the senior administrators including the Chairman of the District Board, the Chief Executive Officer, the Chief Administrative Office, the Chief Operating Officer, the Director of Engineering and Planning, the Acting Director of Human Resources, the Acting Director of Operations, the Manager of Treasury and the Manager of Financial Control.

That group includes two Caucasian women and one African-American/Black male. No Hispanics or Asians are part of this group.

It is fair to say that MDC management over time since 1929 can be characterized as an "old boy" network, featuring almost exclusively white males who have succeeded one another, stayed with the organization during most of their adult, productive lives and hired and promoted persons who look like them. Hiring by word-of-mouth to or from MDC Board members or administrators has long been the practice at the MDC. The current CEO was hired from outside. The current CAO also came from the outside. The COO is home-grown. The Manager of Financial Control,

Commissioner Marilyn Cohen
March 15, 2002
Page 28

Human Resources Department, reported back that the employees received the Union

contract[16].

    A review of the existing Employee Handbook reveals it lacks basic information

on such important issues as wages, benefits, work and discipline rules, Equal

Employment, the Family and Medical Leave Act and other employment policies[17].  It

does not contain an updated Equal Employment Opportunity Statement covering all

protected classifications of employees.  It further fails to include a complaint

mechanism for complaints of sexual and/or other forms of alleged discriminatory

treatment.  It also does not include an ethics policy to be utilized by employees who

raise complaints of inappropriate conduct in the workplace.

    2.   **Affirmative Action Plan**

    **Also absent from the MDC's policy documentation is an updated**

**Affirmative Action Plan.**  The first MDC Affirmative Action Plan we were able to

locate is dated 1996.  The MDC has not sought to review or update its Affirmative

Action Plan since 1997.  It further has not utilized Affirmative Action goals in

reviewing hiring and/or promotional practices.  Other than having an outdated policy,

the District has done little to ensure Affirmative Action goals are in keeping with the

organization's legal obligations.   Recall the MDC is, for purposes of the law a

---

[16] As of this writing, we were presented with a draft employee handbook, which at the Acting Director's direction, was prepared.  There are, however, certain elements missing from this document.

[17] For example, although the document refers to certain policies, these are not included in the Employee Handbook.  These include the Family and Medical Leave Act, Employee Conduct, Performance Management and other policies which should be included.

Commissioner Marilyn Cohen
March 15, 2002
Page 29

"municipality". This is significant. An Affirmative Action Policy, updated and

correct, which includes the goals for the corporation provides a benchmark for

reviewing hiring, retention and promotion practices of protected classes.

The recent hiring of an Affirmative Action Officer with no clearly defined role in

the organization, does not eliminate the need for a Plan which can be supervised by

the Affirmative Action Officer. He must interact with staff and supervisors. We met

few employees who had met the Affirmative Action Officer or understood his role. As

matters currently stand, the Affirmative Action Officer has been provided with little

guidance as to what his duties are and has met with some resistance concerning his

authority in the organization and the scope of his involvement in practices heretofore

reserved to personnel in the Human Resources area.

### 3.  Equal Employment Opportunity and Discrimination Policies and Practices

There is no clearly defined anti-harassment policy prohibiting sexual and

other forms of discriminatory treatment.  The need to have appropriate complaint

mechanisms to raise complaints of such discrimination is critical in providing claims

and defending lawsuits based upon allegations of violations of Title VII of the Civil

Rights Act and/or Connecticut General Statutes Section 46a-60 et seq. The Supreme

Court decision of Ellerth v. Burlington Industries, 524 U.S. 742 (1998) provides for an

affirmative defense to claims of discriminatory, harassing hostile work environment

where the employer is able to establish that (1) the employer exercised reasonable

care to prevent and promptly correct sexually harassing behavior; and (2) the

Commissioner Marilyn Cohen
March 15, 2002
Page 30

employee fails to take advantage of any preventative or corrective opportunities set down in the policies and procedures of the employer. This decision clearly speaks to the need to have a documented and disseminated policy against discrimination and the proper investigation of such complaints. No such policy currently exists at the MDC.[18]

### 4.    Internet and E-Mail

We found no evidence of any internet and e-mail policy which prohibits downloading and transmitting inappropriate material. Company e-mail and internet should be used for business and internal company communications only and employees must be encouraged via a written policy to use the internet only for job-related research and activities. It is critical to educate employees so that they understand not only that the private use of company e-mail is prohibited but also that such a policy is designed and intended to protect the company. Increasingly Courts hold employers liable with respect to claims of sexual and other forms of harassment, based upon the inappropriate use of e-mail and the internet.

### 5.    Violence in the Workplace

Since September 11th, employers in America face an entirely new set of employee concerns over workplace safety and security. Before those attacks, most companies like the MDC never thought about dealing with terrorist threats, biochemical hazards or potential destruction of the workplace.

---

[18] You will recall we have provided such a policy to the District which we recommend be posted and disseminated to all employees.

*Commissioner Marilyn Cohen*
March 15, 2002
Page 31

**We did not see any safety or security plan in place at the MDC.** We saw, for example, no documentation of any escape plan, and no evidence of security measures to be taken should any kind of attack occur at the treatment plants run by the MDC.

We received a recently proposed draft of a violence in the workplace plan. While we believe it is a good first attempt. After September 11, 2001, safety and security in the workplace must be given a priority at the MDC especially given the services the company provides to citizens of this State. There appears to be no plan in place in the event of water emergency.

F.    **Hiring And Selection Procedures**

We reviewed the MDC's hiring and selection procedures, including its job posting, application and interview procedures as well as a review of the job descriptions for positions in the District. **While the policies themselves do not appear discriminatory or unfair, what may occur in practice leads to different perceptions.**

1.    **Lack of A Consistent Job Posting and Job Selection Policy**

a.    **Job Descriptions.**

In general, our investigation revealed job descriptions that have not been upgraded despite the passage of time and the improvement of technology. Engineering job descriptions which fail to recite the need for applicants to have computer drawing (CAD) expertise and facility stood out. Supervisory personnel in Operations and in Administration complained about outdated job descriptions.

Commissioner Marilyn Cohen
March 15, 2002
Page 32

Managers and supervisors complained that they were not getting the best people for

the jobs - a situation which for many years was not a problem at the MDC, which was

once the most respected utility company and a place where non-member municipal

and state agents turned for advice.  We saw increased job revaluation requests, by

employees who were doing the more sophisticated or upgraded work over time, but

not being paid for it.

In the past, Human Resources claimed control over this area, did the

interviewing for new hires and sent to managers and supervisors people who were

found to have few to none of the necessary skills.  It is the height of arrogance for a

Human Resources analyst to purport to define for an experienced supervisor the

qualifications of a technical position and to deliver for interview and hiring persons

believed fit the bill without even consulting with the manager or supervisor.

We spoke with long-term managers and supervisors who were recruited out of

college by the MDC based on their qualifications.  They indicated that it is not the

practice of the MDC to send qualified staff to find the best and the brightest in the

college or university setting.

b.    **Job Postings**

The MDC's job posting policy for both new and open positions at the employee

and supervisory level is also problematic.  The District has adopted and codified a job

posting policy for new and open positions. While employers have no per se legal

obligation to post open jobs, those who have adopted such a policy and have agreed

Commissioner Marilyn Cohen
March 15, 2002
Page 33

to it by virtue of a union contract must ensure all employees have an equal

opportunity to apply for positions and that the policy is applied consistently.

With most positions at the MDC, the Union contracts dictate the number of

candidates which can be qualified for the position prior to being interviewed. The

initial review of the applicants and the their qualification, however, is performed by a

Human Resource Analyst, without any input from the supervisor as to the

qualifications needed for the position or whether the job description being used

accurately and adequately describes the position. Here too, we have yet to see any

input from the newly hired Affirmative Action Officer. We learned from many

supervisors that they are <u>never</u> consulted in the initial selection process. This is

**another example of a failure of communication between the Human Resources**

**Analyst and the Supervisor in Operations or Administration.** Who better than the

supervisor or manager knows what is needed to do the job and whether the applicant

qualifies. Human Resource Analysts we interviewed simply saw no place for the

supervisor in these determinations, clearly, a foolish notion and practice which must

be changed. When we interviewed a director in Engineering, we learned that the

Human Resources Analyst typically has no familiarity with the requirements of the

position; yet he/she is charged with assessing qualifications and making this

determination.

With positions not governed by union contracts, the Human Resources Analyst

again infrequently consults with the supervisor to determine the qualifications

Commissioner Marilyn Cohen
March 15, 2002
Page 34

necessary.  Moreover, although the rule of "three or five" (as outlined in those union

contracts governing employees) does not apply, the supervisor is nevertheless

presented unilaterally with a limited number of candidates and is allowed no input

as to whether or not other applicants for the position should be interviewed.  Many

supervisors expressed frustration at not being able to review <u>all</u> applicants and to

decide or input whether others should be interviewed.

The job posting policy has also been inconsistent.  For example, rather than

post some positions, an "acting" appointment is made.  What this really means and

whether the term "acting" is uniformly applied appears to depend on the position.  In

some circumstances, an acting appointment is made because of a vacancy, such as in

the case of the Director of Human Resources.  In other cases, an "acting" designation

is made because the MDC wants to create a new position, is awaiting approval of

that position administratively and the appointment is effective until that happens.

When this occurs, there is no posting of the position and more likely than not the

employee who was in the acting position ends up filling the job.  This, of course,

creates a perception of unfairness in that an opportunity which would otherwise be

available to anyone who claimed to be qualified has been denied.  In the case of

positions governed by the union contracts, this can be problematic and can expose

the District to claims of unfair treatment.

In the case of the Acting Director of Human Resources, the MDC moved quickly

to fill a vacancy while searching for a permanent designee.  Even though it posted the

Commissioner Marilyn Cohen
March 15, 2002
Page 35

position internally, the MDC determined it needed to go outside to seek an

appropriate candidate to fill this position. This became another embarrassment for

the MDC when a African-American woman selected was rejected by the Board and a

second African-American woman from another state determined to stay put when her

current employer raised her pay. Internally at the MDC the perception, again,

became that qualified majority persons need not apply. The Acting Director in place

has been told that she is not qualified, thereby undermining her ability to do the job.

There is nothing which prohibited the MDC from looking beyond its own walls for a

candidate to fill the position. However, appointing an Acting Director of Human

Resources who the MDC does not view as qualified creates a perception that the

process is unfair. If the MDC, to maintain continuity of performance, believes it

necessary to fill such a position with acting personnel, it should do so and then move

quickly to hire a replacement. It should communicate this decision in advance to all

concerned and be up front with the rationale for the decision.[19]

### 2.    Job Revaluation Process

Another process in need of reform is the job revaluation or reclassification

process, which permits jobs to be reclassified to acknowledge, by an increase in pay,

additional duties being done which were originally not part of the job description.

_____

[19] For example, the appointment of an Acting Director of Human Resources has caused many to believe they were denied an opportunity to apply for the position. Two points should be made here: (1) The Acting Director of Human Resources does appear equipped to handle the position and has instituted many important changes; (2) the District should have flexibility with the idea that in a managerial employee has to be hired according to a job policy designed around union employees. If the District believes the position should be filled with an outside candidate, do it and move on.

Commissioner Marilyn Cohen
March 15, 2002
Page 36

Frequently, the decision to reclassify a position is left to the Human Resources

Analyst, who makes an independent assessment of whether the job classification is

necessary. Although the supervisor does make an initial written recommendation on

the job reclassification, the final decision is made by the Human Resources Analyst

with, usually, no further input from the supervisor. In addition, because of the

changing nature of positions and developing technology at the MDC, outdated job

descriptions increasingly do not correctly define the requirements for positions.

G.   <u>The Performance Review Process</u>

The **Performance Review Process** also is outdated and is not being used in a

**constructive manner.** Performance reviews must be used to comment and critically

evaluate an employee's performance. They should be done, if at all, regularly.

Performance reviews are only worth doing if they are done in a meaningful way. This

includes a performance review system which requires commenting on performance.

The current performance review system provides <u>no</u> incentive on the part of the

supervisor or the employee to perform. In many corporations, performance reviews

are considered a direct reflection of the supervisor's performance and a tool to

evaluate his/her skills. At the MDC, performance reviews are scaled "A"; "B"; or "C"

with A being superior; B being acceptable; and C meaning needs improvement.

Statistical evidence, compiled by the Department of Human Resources shows the

average performance review is a "B". Employees who rate an A or C are entitled to

comment by the reviewer; however, a B review does not require comment.

Commissioner Marilyn Cohen
March 15, 2002
Page 37

Employees, many of them at the top of the pay grade, knowing they are not entitled to any further increases do not work beyond the "B". Reviewers, knowing they do not have to comment if they issue a "B" opt for that alternative most often. Ms. Poirer reported that between 80-100 employees had not received any raise in over ten years.

We did note that performance reviews in the Operations side of the organization are utilized to evaluate performance in a consistently more constructive manner. Supervisors who report directly to the Chief Operating Officer ("COO") reported they go over all reviews they prepare with the COO and that he "signs off" on them. The supervisors in Operations understand that poor performance reviews reflect negatively not only on the employee but also on them. The supervisors therefore have more incentive to do a better job training and observing employees. They also utilize the reviews as a means to comment upon performance.

However, in the area of Finance Management at MDC, performance reviews are not performed on an annual basis and supervisors do not meet with the Manager to review their reviews. We spoke to supervisors who indicated they had completed reviews that never saw the light of day after they were sent to the manager's office. Employees are not advised of those issues in any sort of constructive manner.[20]

In part, the review process at the MDC is not seen as a means of evaluation because too frequently it has no real impact in economic terms. For example, in the case of management, several managers had not received any raise tied to

_____

[20] We understand a proposed performance review system for exempt employees Grade 15 or higher has been presented and approved by the Pension Review Committee.

Commissioner Marilyn Cohen
March 15, 2002
Page 38

performance in over ten years. The Acting Director of Human Resources reported that a primary motivation for the performance based review system she has recently developed. (A copy of said Proposal is attached hereto as Exhibit J) was the finding that many managers, and in particular two in the Engineering Department, had not received, other than cost of living increases, any raises in years. Another employee, a supervisor in the Finance Department, had also not received any form of a raise in several years. **The performance review system, therefore encourages average performance on the part of employees.**

This holds equally true for those employees who are members of the three Unions. Once an employee reaches the top of his/her job classification, there are no further opportunities for raises beyond cost of living adjustments. **We endorse the notion advanced by several managers and supervisors that would provide appropriate incentives to dedicated, top performers.**

H.    Discipline Policies and Procedures

**We also saw the lack of consistency in the application of disciplinary practices.** While the MDC's union contracts do dictate a form of progressive discipline, which in some ways places certain constraints on the disciplinary process, the MDC has not permitted its supervisors to discipline its employees according to a uniform disciplinary policy.[21]    Consistent training on how to discipline employees

---

[21] The Acting Director of Human Resources has worked with supervisors and involved them in disciplining the employee.

Commissioner Marilyn Cohen
March 15, 2002
Page 39

eliminates perceptions of unfairness which impact employee morale and encourages charges of discrimination. The disciplinary process in the Employee Handbook should be clearly explained.

In addition, we interviewed several employees who reported that supervisors and managers maintain separate disciplinary files and notes on employees apart from those documents maintained in the official personnel file. This leads to two problems: (1) appropriate documentation should always be maintained in the personnel file to provide the necessary back up to an employee's disciplinary action; (2) separately maintained discipline files can lead to claims of unfair or disparate treatment and claims of attempts to build a case against an employee where one would otherwise not exist. By statute, an employee is entitled to a complete copy of his or her personnel file upon providing a written authorization to their employer. Any documentation regarding discipline should be in this file.

If the MDC has determined to utilize job performance reviews, they can be an effective, appropriate tool to allow the employer to put the employee on notice of performance deficiencies. In the private sector, job performance reviews are utilized as a means to critically evaluate the performance of the employee and, as necessary, to justify disciplinary action. The MDC needs to commit fully to the practice and use of these instruments. Supervisors must be convinced of the need for candor and fairness in evaluating employees.