```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2
     - - - - - - - - - x
 3   DAISY CHAVEZ,
             Plaintiff,              CASE NO.
 4                                   302CV458 (SRU)
         vs.
 5
     THE METROPOLITAN DISTRICT
 6   COMMISSION,                     November 15, 2002
             Defendant.
 7   - - - - - - - - - x

 8                              COPY
 9

10
                DEPOSITION of RICK GOMEZ
11

12

13   Taken before Cindy J. Carone, LSR 383, a
     Licensed Shorthand Reporter and Notary Public,
14   within and for the State of Connecticut, pursuant
     to Notice and the Federal Rules of Civil
15   Procedure, at Law Offices of Gilman & Marks,
     Two Riverview Square, 99 East River Drive,
16   East Hartford, Connecticut, on November 15,
     2002, commencing at 1:01 p.m.
17

18

19

20

21

22

23
               Falzarano Court Reporters
24                117 N. Saddle Ridge
               West Simsbury, CT  06092
25                  860.651.0258


                       EXHIBIT E
```

```
 1   APPEARANCES:

 2      For the Plaintiff:

 3          GILMAN & MARKS
            Two Riverview Square
 4          99 East River Drive
            East Hartford, Connecticut   06108
 5          860.282.0301
                By:   ROBERT W. HEAGNEY, ESQ.
 6

 7      For the Defendant:

 8
            ANTHONY J. PALERMINO
 9          945 Wethersfield Avenue
            Hartford, Connecticut   06114
10          860.296.0035

11
        Also present:
12
            Daisy Chavez
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    S T I P U L A T I O N S
 2            It is stipulated by counsel for the parties
 3    that all objections are reserved until the time of
 4    trial, except those objections as are directed to the
 5    form of the question.
 6            It is stipulated and agreed between counsel
 7    for the parties that the proof of the authority of the
 8    Notary Public before whom this deposition is taken is
 9    waived.
10            It is further stipulated that any defects in
11    the Notice are waived.
12            It is further stipulated that the deposition
13    may be signed before any Notary Public.
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                (Deposition commenced:  1:01 p.m.)
 2
 3          RICK GOMEZ, Deponent, having been first
 4     duly sworn by the Notary Public was examined
 5     and testified, on his oath, as follows:
 6
 7                    DIRECT EXAMINATION
 8
 9   BY MR. HEAGNEY:
10        Q    Mr. Gomez, my name is Rob Heagney, here
11   today representing Daisy Chavez with regard to
12   complaints she had regarding her employment at the
13   MDC.  Are you familiar with those?
14        A    Yes.
15        Q    Have you had your deposition taken before?
16        A    Yes, in another matter.
17        Q    What was that in?
18        A    A matter concerning my former employer,
19   CHRO.
20        Q    Who was taking your deposition?
21        A    I believe David Teed of the Attorney
22   General's Office.
23        Q    What was the necessity of your testimony?
24        A    Concerning a lawsuit brought by a CHRO
25   employee.
```

Falzarano Court Reporters

1  A   They were promulgated, I believe, in CHRO in
2  1995.
3  Q   Had they been approved by legislature?
4  A   I believe so.
5  Q   Have you had an opportunity to review any
6  federal plans?
7  A   No.
8  Q   What do you understand the difference
9  between a state plan and a federal plan to be?
10 A   The state plan is basically set off by law
11 by the state legislature.  The federal plan is
12 reviewed by the Department of Labor, has special
13 guidelines where they have to review the plan and
14 special procedures.
15     With the federal plan, for one thing for
16 example, the MDC is not required to file a federal
17 plan.  It's voluntary; although, we're following the
18 federal guidelines for developing the plan.
19 Q   When you say you're not required to file a
20 plan --
21 A   Not required by the federal government to
22 submit a plan for audit by the Department of Labor.
23 Q   Are you required to have a plan?
24 A   I'd have to refer to legal counsel to have
25 an answer for that question.  I'd say since we haven't

1   filed, updated the plan in six or seven years, not
2   required to have one that is updated. I would think
3   certainly we should have one for district purposes for
4   issues of diversity and affirmative action.
5       Q   Does the Metropolitan District Commission
6   receive federal grants?
7       A   Not that I'm aware of, no.
8       Q   If they received federal grants, would that
9   change the requirement?
10      A   If $50,000 or more, I believe it would.
11      Q   Have you reviewed their receipt of the
12  grants?
13      A   No, I have not, not in that respect; but
14  from my understanding from what I discussed before I
15  began the process of putting it together, the
16  affirmative action plan, we don't receive federal
17  grants of $50,000 or more.
18      Q   You indicated that there was an affirmative
19  action plan and policy from 1995-'96?
20      A   From '96, '97, I believe.
21      Q   Is that still in force?
22      A   It's still in force, but the statistics are
23  unreliable and outdated; and I would not use it to
24  make any type of measurement of judgment on any type
25  of hiring or anything else concerning EEO.

1    Q    But there's other aspects of the affirmative
2    action plan and policy that are not dependent upon the
3    statistics?
4    A    That's correct.
5    Q    Do you consider them to still be in force?
6    A    I would say until they're updated, they
7    would definitely still be in force.
8    Q    Have you ever told Ms. Chavez that the MDC
9    did not have an affirmative action plan?
10   A    No, I don't recall that. In fact, I gave
11   Ms. Chavez a copy of the affirmative action plan that
12   I had in my office of the '96-'97.
13   Q    You've been operating pursuant to that plan?
14   A    No, I have not been operating pursuant to
15   that plan.
16   Q    Why not?
17   A    I guess it depends what you mean by
18   "operating."  Can you explain what you mean by
19   operating?
20   Q    As the affirmative action officer, you have
21   certain responsibilities that are related to the
22   affirmative action plan?
23   A    Correct.
24   Q    Have you been operating pursuant to that
25   plan?

```
 1        A    I've been operating -- I guess if you mean
 2   the procedures in there that are set up, but not
 3   operating as far as any of the statistics of goals or
 4   anything else in the affirmative action plan.
 5        Q    For instance, is the MDC required to post
 6   all jobs?
 7        A    Absolutely.
 8        Q    Where did it say that?
 9        A    I believe it says that in the -- I've only
10   reviewed it once when I came in.  I believe it should
11   be stated in the affirmative action plan.
12        Q    Are you aware that they've hired individuals
13   for jobs or promoted internal people to jobs without
14   posting the job?
15        A    No, I'm not aware of that.
16        Q    So, you've just read the affirmative action
17   plan once?
18        A    Yes.
19        Q    Has anyone shown you the predecessor
20   affirmative action plan?
21        A    No.
22        Q    In your review of the affirmative action
23   plan, did you find it a good plan?
24        A    No, I did not.
25        Q    What did you find deficient in the plan?
```

Falzarano Court Reporters

1    A    I thought the way the plan was put together
2  was not sufficient and comprehensive enough in order
3  to give very sufficient information to make change
4  within the District at that time.
5    Q    To make change in what regard?
6    A    As far as implementing procedures and
7  policies to promote, hire minorities.
8    Q    So that in terms of any promotions that have
9  taken place while you've been there, you've had no
10 role as the affirmative action officer?
11   A    I have not had a role in promotions. The
12 only role that I've had has been in certain levels of
13 hire or promotion. I've been -- there's an informal
14 process where I review them with the CEO, but no
15 formal process laid out yet for that.
16   Q    What jobs have you reviewed with the CEO?
17   A    I've reviewed the director or manager of
18 operations. I've reviewed the director of health and
19 environmental services,
20   Q    Anything else?
21   A    That's it.
22   Q    What review did you undertake?
23   A    Basically sitting down with the CEO and
24 discussing the three candidates for the position and
25 my observations or comments on if I felt that these