

FILED

Feb 13   12 oo PM '04

U.S. ....

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **KENDRA HEWITT, DARLENE WHALEY**<br>**And ETHEL L. WRIGHT** | **CIVIL ACTION NO.:** |
| **PLAINTIFFS** | **301CV2037MRK** |
| **vs** | **February 13, 2004** |
| **METROPOLITAN DISTRICT COMMISSION**<br>**DEFENDANT** | |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANT'S</u><br><u>OBJECTION TO CLASS CERTIFICATION</u>

## I. <u>INTRODUCTION</u>

The Plaintiffs, Kendra Hewitt, (Hewitt), Darlene Whaley (Whaley) and Ethel

L. Wright (Wright) filed a complaint alleging race discrimination under 42

U.S.C. Section 1981 and Title VII of the Civil Rights Act of 1964. The Plaintiffs

allege a pattern in practice of race discrimination by the Metropolitan District

Commission (MDC) in the following areas:

1. Discrimination in the performance evaluation system;

2. Discrimination in compensation practices; and

3. Discrimination in promotions.

The Plaintiffs allege that the conduct of the MDC in these areas demonstrate

disparate treatment of African American employees.

-2-

The Plaintiffs are seeking class certification and filed their motion on January 19, 2004. The Defendant objects to the class certification, and the reasons for this objection are stated below.

The individual Plaintiffs have alleged the following discriminatory acts:

1. Kendra Hewitt – Hewitt alleges that a promotion was withheld for 3½ years, and she is entitled to full retroactive pay for that period; Plaintiffs' complaint at paragraph 7.

2. Darlene Whaley – Whaley alleges she was denied a promotion. She then received an upgrade in her position but did not receive retroactive pay. Plaintiffs' complaint at paragraph 8.

3. Ethel L. Wright – Wright alleges she was denied promotions to the positions of Assistant to the District Clerk, a Senior Human Resources Analysis, and Contract Services Administration. Wright also alleges that she was denied an opportunity to act as Project Administrator prior to the position being filled on a permanent basis. Plaintiffs' complaint at paragraph 9.

As noted above, the Plaintiffs are seeking class certification. The Plaintiffs seek to represent a class of all African American persons or persons of color employed by Defendant MDC in positions at any time from December 1998 to the present, who are subject to MDC's employment and human recourses policies and practices; including, but not limited to, current or former employees.

-3-

Plaintiffs' complaint at paragraph 15.

The Plaintiffs and class members seek injunctive relief, lost wages, and benefits, as well as compensatory and punitive damages, see Plaintiffs' complaint, Prayer for Relief.

The Defendant submits that the Plaintiffs have not met their burden under Federal Rule 23, and class certification should be denied.

## II. FACTS

### A. Organizational Structure of the MDC.

The following facts are provided in the affidavit of Robert Zaik, Manager of Labor Relations for the MDC, Exhibit A.

The MDC provides water and sewer services in and around Hartford County. The MDC has also become involved with supplying hydro electric and solid waste conversation to energy services. The Defendant has 8 towns in the greater Hartford area which are members: Rocky Hill, Newington, Wethersfield, Hartford, West Hartford, Bloomfield, East Hartford and Windsor. The MDC operates water and waste water treatment facilities in West Hartford, Bloomfield, Rocky Hill, Poquonock, Collinsville, and East Hartford. The MDC also operates 2 hydro electric facilities, Goodwin Dam and Colebrook Dam. The MDC has a central administration office in Hartford. Zaik at 5, 6, and 7.

-4-

The MDC is governed by a 29 member commission, which establishes policy for the MDC. The Chief Executive Officer is authorized to enforce the policy and to supply executive management. The MDC also has a Chief Operating Officer and Directors responsible for the administration of the following departments: Administrative Services, Human Resources, Information Technology, Finance, Operations, Waste Processing and Plant Maintenance, Environment Health and Safety, Engineering and Planning, and Water Treatment and Supply. Zaik at 8 and 9.

Each department is responsible for a certain set of activities within the MDC. The direction of a particular activity is provided by either a manager or superintendent, who in turn direct the various supervisors and crew leaders in the work units. Zaik at 10.

The Defendant has a long-term contractual relationship with Connecticut Resources Recovery Authority to operate the facilities and processes under the Mid-Connecticut Project. Within the Mid-Connecticut Project, the MDC maintains and operates the Ellington Transfer Station, the Hartford Landfill, the Essex Transfer Station and the Waste Processing Facility (Hartford). The MDC staffs mobile equipment maintenance and transfer truck driver units. Zaik at 11.

The MDC is affiliated with three Locals of the American Federation of State, Municipal and County Employees, COUNCIL 4, AFSCME. Supervisory staff,

-5-

engineering, technical and clerical staff, and, operational and maintenance employees are represented by these 3 locals. Zaik at 12.

The MDC employs 692 employees. Local 184, AFSCME, represents 403 operational and maintenance employees. Local 3713, AFSCME, represents 139 technical and clerical employees. There are 69 supervisors represented by Local 1026, AFSCME. There are also 81 non-Unionized employees. The MDC maintains a special police unit to monitor, patrol and protect its watershed areas. Zaik at 13.

The MDC has negotiated separate contracts governing wages, work schedules and conditions of employment with each of the three bargaining units. The wages, work schedules and working conditions are all different between the bargaining units, (copies of Collective Bargaining Agreements are attached as Exhibits A-2 – A-4. Employees may be assigned to work 7.5 hour days (37.5 hour work week), 8 hour days and 10 hour days (40 hour work week). The Defendant maintains continuous operations (around-the-clock) at its water and wastewater treatment facilities and at the Waste Processing Facility. Zaik at 14.

The MDC has negotiated different overtime and pay provisions with each of its three bargaining units. Certain employees are eligible for double time premium, others are limited to only time and one-half premium, and still others have no overtime premium eligibility. Certain of the non-Unionized employees

-6-

are eligible for straight-time and time and one-half premium, with others not eligible for any overtime consideration. Zaik at 15.

The MDC has negotiated different job selection procedures and processes with each of its three bargaining units and with the non-Unionized group. Each of the procedures and processes is dependent upon supervisory or managerial assessments of the candidates. The Human Resources Department monitors the processes for contract compliance. The selections are made by the supervisors and managers outside of the Human Resources Department.

For instance, with positions represented by Local 184, AFSCME, the Human Resources Department merely screens the applicants to determine which applicants meet the posted job requirements. The qualified applicants are then referred to the Department Head for personal interview. The Department Head assesses and awards points for additional education or experience beyond the posted requirements. Qualified applicants are then provided points for service time and recognition of minority class membership. The total number of points will determine the ranking for the Eligibility List. The offer is made to the highest ranked individual on the Eligibility List.

This selection procedure is markedly different from the procedure negotiated with Local 3713, AFSCME. In these recruitments, the Human Resources Department must assess the applicants against the posted criteria for the particular

-7-

vacancy. The top three rated candidates are referred to the department Head for personal interview. The Department Head receives an alphabetical listing and may select any candidate from the three referred.

The Human Resources Department monitors the processes for contract compliance. The selections are made by the supervisors and managers outside of the Human Resources Department. <u>Zaik at 16.</u>

Performance assessment is performed by supervisors and managers. The assessments are based upon the elements and standards congruous to the specific job classifications. The Defendant has 340 job classifications. The actual assessment determination is primarily predicated upon the subjective reasoning employed by the supervisor or manager making the assessment. Performance reviews may be conducted at the completion of the initial probationary period, the completion of the transfer probationary period, on a semi-annual or annual basis. There are also special six-month reviews. The Human Resources Department reviews the forms to ensure that the required fields are completed. If there are wage or salary adjustments recommended by the supervisors or managers, the Human Resources Department initiates the adjustments. Four different performance assessments forms are used in job performance assessment. <u>Zaik at 17.</u>

-8-

The Human Resources Department conducts classification reviews for each of the three bargaining units and the non-Unionized group.  Within each of the three bargaining units, there are different contract provisions governing the classification review procedure.  Zaik at 18.

Discipline is applied by supervisors or managers outside of the Human Resources Department.  The supervisors and managers will conduct the investigation and collect relevant documentation.  The Human Resources Department reviews the information to make suggestions for further investigation or inquiry.  The decision concerning the level of discipline is made by the supervisor.  Zaik at 19.

Performance demotions, although not significant in number, are determined by supervisors and managers.  The Human Resources Department reviews the documentation and the prior discipline imposed by supervision.  Zaik at 20.

**B. The Plaintiffs have alleged race discrimination in performance evaluations, compensation and promotions.**

The Plaintiffs, Hewitt, Whaley and Wright have alleged a pattern and practice of race discrimination by the MDC.  Each area cited by the Plaintiffs will be discussed below.

**1. Performance Evaluations.**

None of the Plaintiffs have alleged anything concerning discrimination in the

-9-

administration of performance evaluations.  Hewitt, Whaley and Wright have not

stated any facts in the complaint which pertain to discriminatory performance

reviews.  Given this, the Plaintiffs cannot represent a class in this area.

### 2. **Compensation**.

Hewitt and Whaley have alleged that they were denied retroactive pay related

to promotions.  Wright has not made any claim for retroactive pay.

Kendra Hewitt was hired on January 31, 1994, and assigned to work as a

*Work Processor, PT-06,* in the Administrative Services Department.  On June 2,

1996, the Defendant disbanded the word processing unit and physically relocated

the Hewitt to the Treasury Department.  Hewitt was assigned to work for the

*Manager of Financial Control*, Mr. James Michel.  Through a classification

adjustment effected October 3, 1999, Hewitt's classification was upgraded to an

*Accounting Assistant*, PT-09.  Hewitt was assigned to the payroll unit under the

Financial Control Activity.  Hewitt resigned from her employment with the

Defendant effective January 5, 2002, see attached copy of resignation letter,

Exhibit A-6.   Zaik at 23.

The Defendant hired Ms. Darlene Whaley on August 20, 199 5, to work as a

*Customer Clerk*, PT-02, attached to Automated Meter Reading unit.  Effective

May 31, 1998, Whaley was promoted to a provisional *Account Clerk*, PT-05,

position in the Financial Control Activity.  The Defendant converted the position

-10-

into a regular assignment on August 9, 2000.  Effective October 31, 2000, the

Defendant upgraded Whaley's classification to *Principal Account Clerk*, PT-07.

Through a Grievance settlement, executed on August 8, 2001, the Defendant

granted a step increment to Whaley to resolve a dispute concerning Whaley's rank

on an Eligibility List, See attached Settlement Agreement, <u>Exhibit A-7</u>.  Whaley

is currently assigned to the Accounts Payable unit in the Financial Control

Activity.  <u>Zaik at 24.</u>

   3.  <u>**Promotions.**</u>

   The facts related to the employment and promotion of Plaintiffs Hewitt and

Whaley are stated in Section 2 above.

   The Defendant has assigned Ms. Ethel Wright to the position of *Community*

*Affairs Assistant*, EE-10.  Wright was hired on June 21, 1976.  Wright had been

assigned to work as the *Central Clerical Supervisor*, SS-01, in the Administrative

Services Department.  Wright was offered her current position against the

backdrop of reassignments and lay-offs, See enclosed letter, <u>Exhibit A-8</u>.  Wright

did accept said offer and continues to be assigned to the position of *Community*

*Affairs Assistant*, EE-10.  <u>Zaik at 25.</u>

   4.  <u>**The Plaintiffs allege individual claims.**</u>

   It is apparent from the employment history of Hewitt, Whaley and Wright that

-11-

they held different positions, at different salary levels. In addition, the sequence
of promotions, and claims for retroactive pay, are different. Wright has not
alleged a claim for retroactive pay at all. The named Plaintiffs do not have
similar claims, and each presents a unique set of facts. The proof of both liability
and damages will be individualized. The defenses presented by the MDC will be,
by necessity, individualized.

## III.  ARGUMENT
### A.  The Legal standard under Title VII and Section 1981

The Plaintiffs have alleged disparate treatment under Section 1981 and Title
VII.  Under both theories, they must prove intentional discrimination. General
Bldg. Contractors Ass'n. v. Pennsylvania, 458 U.S. *375,* 388-89 n.5, 102 S. Ct.
3141, 3145 *n.5* (1982). Evaluation of the disparate treatment claims will involve
the burden shifting analysis articulated by the United States Supreme Court in
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-
25 (1973), and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, *257,*
101 S. Ct. 1089, 1095-96 (1981). The Plaintiffs bear the initial burden of
establishing a prima facie case.  If the Plaintiffs can establish a prima facie case of
discrimination, the Company is allowed to proffer a legitimate, nondiscriminatory
business reason for its actions. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,
506-07, 113 S. Ct. 2742, 2747 (1993). The Plaintiffs must then produce sufficient

-12-

evidence to support a finding that the legitimate, nondiscriminatory reasons are false <u>and</u> that more likely than not the employees' race was the reason for the action. <u>St. Mary's</u>, 509 U.S. at 515-16.

## B.  The standard for class certification

There are two material issues for the court to address on class certification, which derive from subsections (a) and (b) of Rule 23 of the Federal Rules of Civil Procedure.  The issue under subsection (a) is whether the Plaintiffs can proceed in this case on behalf of an identifiable group of aggrieved African-American employees or former employees who have claims of discrimination that can be pursued on their behalf by the Plaintiffs.  This commonly is divided into the requirements of numerosity - --- that is, is there a sufficient number of individuals with claims to be pursued by the plaintiffs; typicality - --- are the issues that are central to the Plaintiffs' claims central to the claims of the aggrieved class; commonality - --- are there common issues of law or fact to be decided; and adequacy of representation --- can the Plaintiffs adequately represent the class or are there unique defenses to their claims.  <u>See General Tele. Co. v. Falcon</u>, 457 U.S. 147, 156 102 S. Ct. 2364 (1982).

The issue under subsection (b) is whether the case may be maintained as a class action because either (1) the predominant relief sought is injunctive or declaratory, or (2) common questions of law or fact predominate over individual

-13-

issues and a class action is superior to other available methods for the fair and
efficient resolution of the case. Fed. R. Civ. P. 23; <u>Eisen v. Carlisle & Jacguelin</u>,
391 F.2d 555, 564 (2d Cir. 1968), <u>rev'd on other grounds</u>, 417 U.S. 156 (1974).

In this case, the Plaintiffs have failed to meet the requirements of either Rule
23(a) or Rule 23(b).

**C.  The Plaintiffs have not met the requirements of Rule 23(a).**

**1.  The legal requirements of Rule 23(a).**

The Supreme Court has made clear that the court's role on a motion for class
certification is to perform a "rigorous" analysis to determine whether the plaintiffs
have met their burden under Rule 23(a): <u>Falcon</u>, 457 U.S. at 161.  The Supreme
Court repeatedly has cautioned that careful attention to the requirements of the
Rule is essential, even in employment discrimination cases.  <u>See id</u>. at 159; <u>East
Texas Motor Freight Svs.. Inc. v. Rodriguez</u>, 431 U.S. 395, 97 S. Ct. 1891(1977).
Simply because an aggrieved private plaintiff is a member of an identifiable class
of persons of the same race, is insufficient to establish his standing to litigate on
their behalf all possible claims of discrimination against a common employer."
<u>Falcon</u>, 457 U.S. at 159 n.15.

The Plaintiffs must satisfy four requirements to sustain their burden of
demonstrating that they can proceed on behalf of the putative class: numerosity,