# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| Kendra (HEWITT) Morgan, Darlene WHALEY and Ethel L. WRIGHT | : | |
| | : | |
| Individually and as Class Representatives, Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL NO. 3:01CV2037 (MRK) |
| | : | |
| THE METROPOLITAN DISTRICT COMMISSION, | : | |
| | : | |
| Defendant. | : | |

## <u>MEMORANDUM OF DECISION</u>

Plaintiffs Kendra Hewitt Morgan, Darlene Whaley, and Ethel L. Wright filed this action against Defendant Metropolitan District Commission ("MDC") on October 31, 2001 on behalf of themselves and as members of a putative class of African-American salaried, non-managerial employees under Section 1981 of the Civil Rights Act of 1871, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Complaint [doc. #1], at 1 ("Compl."). Plaintiffs seek, among other relief, declaratory and injunctive relief, as well as compensatory and punitive damages for MDC's alleged pattern and practice of race discrimination. *Id.*

Plaintiffs originally filed a Motion for Order Determining That Action Proceed as Class Action [doc. # 5] on October 31, 2001, which was denied without prejudice in order to afford the parties an opportunity to develop the factual issues surrounding class certification. On February

27, 2002, the Court issued a scheduling order [doc. #11] giving Plaintiffs until May 21, 2002 to

file a motion for class certification. Plaintiffs thereafter requested and were granted numerous

extensions of time to file a renewed motion for class certification. *See* docs. ## 13, 15, 16, 17,

and 18.[1] On December 1, 2003, the Court held a status conference with the parties to discuss

scheduling and other outstanding matters relating to certification. Although the deadline for the

close of all discovery and for filing a motion for class certification had passed, Plaintiffs

expressed their interest in conducting even further discovery before filing a motion for class

certification. The Court agreed to extend the discovery deadline once again, but also advised

Plaintiffs to move forward expeditiously with the motion for certification. On December 2,

2003, the Court entered a revised scheduling order [doc. #28] setting January 15, 2004, well over

two years after Plaintiffs initiated their suit, as the deadline for the close of all fact and expert

discovery on individual claims and for the filing of Plaintiffs' motion for class certification.

On January 20, 2004, Plaintiffs filed a Motion for Order Determining That Action

Proceed as Class Action [doc. #31], and the parties, after filing responsive pleadings,[2] appeared

before the Court for oral argument on the motion for class certification. For the reasons set forth

below, the Motion for Order Determining That Action Proceed as Class Action [doc. #31] is

---

[1]The Court notes that some of the delay resulted from the hospitalization of Defendant's counsel from approximately December 2002 to January 2003. However, the case was filed in October 2001, and had therefore been pending for over a year before counsel's illness. The first scheduling order [doc. #11] was issued on February 27, 2002, with discovery for the purposes of class certification set to close by April 30, 2002. Even taking into account the hiatus due to counsel's illness, the parties have had more than sufficient time to conduct discovery on both the individual claims and on class certification issues.

[2]Defendant's Objection to Class Certification [doc. #35] and Exhibits("Obj. to Class Cert."); Memorandum in Reply to MDC's Objection That Action Proceed as Class Action [doc. #37] ("Reply to Def.'s Obj.").

DENIED.

# I.

## A. The Metropolitan District Commission

The named Plaintiffs in this case, Ms. Hewitt, Ms. Whaley, and Ms. Wright, are former or current employees of Defendant MDC. MDC, which employs approximately 692 employees, operates water and wastewater treatment facilities in West Hartford, Bloomfield, Rocky Hill, Poquonock, Collinsville, and East Hartford. Affidavit of Robert J. Zaik [doc. # 36], Ex. A ¶¶ 7, 13 ("Zaik Affidavit"). MDC provides water and sewer services in and around Hartford County, and is involved with supplying hydro-electric and solid waste conversion to energy services. *Id.* MDC has a central administration office in Hartford, Memorandum in Support of Defendant's Objection to Class Certification [doc. #36], at 3 ("Mem. in Obj. to Cert. "), and is governed by a 29-member commission, which establishes policy for MDC. *Id.* Seventeen of the Commissioners are appointed by Member Town Councils, eight are appointed by the Governor, and four are appointed by designated members of the General Assembly. Zaik Affidavit, ¶ 8.

## B. The Named Plaintiffs

**1. Kendra Hewitt.** Ms. Hewitt is African-American and a former employee of MDC who, as Plaintiffs informed the Court at oral argument, voluntarily resigned in late 2001 after more than six years as a Payroll Accounting Assistant at MDC.[3] Ms. Hewitt alleges that during her years in the Payroll Department, she experienced discrimination in performance evaluations,

---

[3]Ms. Hewitt resigned from MDC by letter. *See* Letter [doc. # 36], Ex. A-6. The letter, dated December 20, 2001 and addressed to Ed Skowronek, reads: "As of today I am handing in my two-week notice. January 5, 2002 will officially be my last day."

promotions, and in the terms and conditions of her employment.  Compl. ¶ 7.  Ms. Hewitt also

alleges that during her six years as an employee for MDC, she experienced and witnessed racial

discrimination in employment; she was denied her proper title and pay for three and a half years

while newly hired and long-standing Caucasian employees were promoted; she was lied to,

harassed, and her reputation defamed when she began to question why she had not been

promoted; the Human Resources Director and CEO of MDC limited Ms. Hewitt's opportunity for

training and becoming more proficient in her job; the Director of Human Resources made it

known that she did not want Ms. Hewitt to perform the job that her boss had assigned to Ms.

Hewitt; that Ms. Hewitt was excluded from meetings that pertained to her job; when the Director

of Human Resources could not longer substantiate withholding Ms. Hewitt from promotion, Ms.

Hewitt was given the proper title and received a pay raise but 3.5 years after she should have

received the title and pay raise; and Ms. Hewitt was denied her full retroactive pay, which

Caucasian employees were routinely granted.  *See* Compl. ¶ 7(a)-(i).

      **2.  Darlene Whaley.**   Ms. Whaley is an African-American employee of MDC, where she

has worked since around 1994 in various positions.  Compl. ¶ 8.  She alleges that in her current

and former positions at MDC, she experienced discrimination in performance evaluations,

promotions and in the terms and conditions of her employment.  *Id.*  More specifically, the

Complaint asserts that Ms. Whaley was working in an upgrade position in the Accounts Payable

Department for approximately six months while the upgrade position was posted for applicants.

The position was open after the employee who had previously occupied the position was

promoted to a different department.  Ms. Whaley applied for the position she was temporarily

assuming, but was denied the permanent position.  The position was given instead to a Caucasian

individual who had no experience with accounts payable.  When Ms. Whaley inquired about

MDC's hiring decision, the Personnel Department denied that its decision was racially motivated

and stated that an African-American employee had compiled the list of final candidates for the

job.  *See* Compl. ¶ 8(a)-(f).

After Ms. Whaley was turned down for the upgrade position in the Accounts Payable

Department, Ms. Whaley's Manager, who is African-American, requested an upgrade for Ms.

Whaley.  Following two months and numerous letters and phone calls, Ms. Whaley was granted

an upgrade, though she was denied retroactive pay.  *See* Compl. ¶ 8(h)-(i).  Ms. Whaley obtained

the upgrade through a Grievance Settlement, executed on August 8, 2001.  *See* Settlement

Agreement [doc. # 36, Ex. A-7].[4]  The Complaint alleges that Caucasian employees of MDC who

have sought an upgrade do not face the impediments and delays experienced by Ms. Whaley, and

that Caucasian employees typically receive retroactive pay when their positions are upgraded.  In

addition, Ms. Whaley asserts that Caucasian employees in her area would not be reprimanded or

written up by supervisors when they blatantly disobeyed an order.  Ms. Whaley claims to have

witnessed the termination of a temporary employee, an African-American, who worked hard and

tried to "clean up" the  Accounts Payable Department, but whom the Caucasian managers

---

[4]The contents of the Settlement Agreement [doc. # 36, Ex. A-7] are as follows:

"The Metropolitan District, hereinafter 'the District', Local 3713, AFSCME, hereinafter, 'the Union,' and Ms. Darlene Whaley, hereinafter, 'the Grievant,'in consideration of the promises made herein, including the execution of this agreement, agree as follows:

1. Effective the Sunday following the date of execution of this agreement, the District shall adjust the Grievant's rate of pay to PT-07, Step 3.

2. The Grievant, through the Union, shall withdraw Case No. 2001-A-310 from arbitration before the State Board of Mediation and Arbitration.  Said withdrawal shall be with prejudice.

3. Nothing herein, shall be construed as an admission of any contract violation.

All terms and conditions above, agreed to this 8/8/01 day of August, 2001."

perceived as threatening to them.  The temporary employee was replaced by a Caucasian female whom Ms. Whaley claims worked less than the dismissed African-American female.  The Caucasian was allegedly a daughter of an MDC employee and was treated differently from the African-American temporary employee.  *See* Compl. ¶ 8(j)-(l).

**3. Ethel L. Wright.**    Ms. Wright is African-American and has worked for MDC since around 1976, most recently as a Clerical Services Supervisor.  Ms. Wright alleges that she has experienced discrimination in performance evaluations, promotions, and in the terms and conditions of her employment.  *See* Compl. ¶ 8.  Ms. Wright was hired by MDC as an Administrative Clerk at MDC Headquarters, completed her probationary employment, and, after mastering the knowledge and skills of her Administrative Clerk position, became a Senior Clerk/Typist and Account Clerk.  *Id.* ¶ 8(a)-(b).  During the course of her employment at MDC, Ms. Wright attended college part-time but claims she was denied tuition reimbursement by MDC while attending Greater Hartford Community College in the 1980's.  Ms. Wright furthered pursued and obtained, with tuition coverage by MDC, a Masters of Management Degree and an Organization Development Certificate from Cambridge College.  *Id.* ¶ 8(d)-(e)

Since her graduation from Cambridge College in May 1999, Ms. Wright has applied for and been denied several positions at MDC.  For example, Ms. Wright applied to be the Assistant to the District Clerk, but the position was awarded to a Caucasian male.  Ms. Wright was informed that she did not qualify as one of the final three candidates for that position.  When Ms. Wright queried the District Clerk about how to qualify for the Assistant position, the District Clerk allegedly told Ms. Wright that she was doing a fine job in her current position and that the other candidates for the position had been Caucasian females, neither of whom was suited for the

job, and a Caucasian male, who was hired based on his strong political background.  Ms. Wright asserts that the job posting for the Assistant position did not list a political background as a prerequisite for the job, and Ms. Wright maintains that the District Clerk failed to inform her of what she would need to do to qualify for the Assistant position.  *See* Compl. ¶ 8(f)-(j). Thereafter, Ms. Wright again applied to be the Assistant to the District Clerk when there was a vacancy, but Ms. Wright was turned down a second time for the position after she took MDC's transcription examination, which involved use of a tape recorder rather than a transcribing machine with speed control – the device Ms. Wright alleges was commonly used at MDC.  *Id.* ¶ 8(k)-(s).

          After she was denied the Assistant to the District Clerk position the second time, Ms. Wright applied for the Senior Human Resource Analyst position.  Compl. ¶ 8(t).  The Human Resources Department informed Mr. Wright that an African-American female was offered, but then declined, the position.  Mr. Wright was informed that the successful candidate had 16 years of experience in benefits, although Ms. Wright asserts that the job position did not specify benefits experience as the only required skill.  At the request of Ms. Wright, the Human Resources Director met with Ms. Wright before the Senior Human Resources Analyst position was awarded.  The Director told Ms. Wright that the Director was focusing on someone with a strong benefits background, and Ms. Wright was not considered for the position.  *See id.* ¶8(u)-(y).

          Ms. Wright also alleges that in 1997, Ms. Wright's former boss, Norman LeBlanc, told Ms. Wright that the Central Services Administrator ("CSA") position that she sought had been eliminated from the budget.  However, according to Ms. Wright, the CSA position remained in

the annual budget, though Ms. Wright was not considered for the CSA position.  Ms. Wright also states that Mr. LeBlanc informed her that with the 1997 budget, her position, which was now known as Project Administrator, would no longer involve administrator duties.  Ms. Wright asserts that she was not chosen to be an acting administrator in anticipation of the CSA position, while other Caucasian employees have served in acting positions when MDC needed to provisionally fill a position.  *See* Compl. ¶ 8(z)-(dd).

In or around May 2000, Ms. Wright's former boss, Mr. LeBlanc, retired as Manager of Treasury and was replaced by Stephanie Russo.  Ms. Wright asserts that Ms. Russo has not held a staff meeting with Ms. Wright to discuss Ms. Russo's planned organizational changes despite Ms. Wright's attempts over a seven-month period to meet with Ms. Russo.  Ms. Russo allegedly cancelled a scheduled meeting with Ms. Wright and failed subsequently to reschedule the meeting.  *See* Compl. ¶ 8(ee)-(gg).

### C.  The Proposed Class

The named Plaintiffs seek to represent the following class: "All African-American persons employed by MDC in non-managerial positions at any time from October 1998 to the present, who are or were subject to the MDC's employment and human resources policies and practices, including, but not limited to, current or former employees."  Memorandum in Support of Motion for Order Determining That Action Proceed as Class Action [doc. #32], at 2 ("Mem. in Supp. of Class Action").  At oral argument, the Plaintiffs sought to justify their proposed class on the basis of MDC's alleged pattern-or-practice of discriminatory treatment of African-Americans and MDC's alleged failure to comply with statutory affirmative action policies.

The following MDC employees submitted affidavits in support of the named Plaintiffs'

motion for class certification: Linwood Braswell, Charles Davis, Wesley Mitchell, Keith

Quildon, Monnece F. Ritter, Keith Slaughter, Jennifer Taylor, Robert J. Weatherly, III, Douglas

Woods, and Ronald Woods.  Mem. in Supp. of Class Action, Ex. C.[5]

    **1. Linwood Braswell**.  Mr. Braswell was hired by MDC in June of 1988 as a Plant

Operator in Training at the Sewer Plant.  Mr. Braswell's affidavit consists entirely of his

observations of alleged discriminatory treatment experienced by other MDC employees.   Thus,

Mr. Braswell's affidavit alleges that "I have observed African-American [] employees more

commonly given poor performance evaluations than Caucasian employees," that "[i]n my

personal experience and from my observation of the treatment of African-American [] employees

within the Trash to Energy Plant, I have observed African-American employees much more

commonly being disciplined in terms of reprimands, suspensions and terminations, and

demotions than any Caucasian employees," and that "I have observed the failure of the MDC to

---

    [5] There are two other MDC discrimination cases currently pending before this Court: *Chavez v. Metropolitan District Commission*, No. 3:02cv457 (MRK), and *Liebert Thomas v. Metropolitan District Commission*, No. 3:02cv458 (MRK).  Both Ms. Chavez and Mr. Thomas submitted affidavits in connection with the *Hewitt* class action motion.  *See* Affidavit of Daisy Chavez and Affidavit of Liebert Thomas [doc. #32], Ex. C.  However, at oral argument, counsel for the named Plaintiffs and the putative class (who also represents Ms. Chavez and Mr. Thomas in their individual cases against MDC) represented to the Court that neither Ms. Chavez nor Mr. Thomas falls within the putative class.  Ms. Chavez is of Hispanic origin and the putative class consists only of African-Americans; Mr. Thomas was in a managerial position at MDC, but the putative class is limited to non-managerial employees.  Because neither Ms. Chavez nor Mr. Thomas would be members of the class, the Court need not, and does not, consider their affidavits in connection with the pending class certification motion.

    Curley Richard filed an affidavit in support of class certification ("Affidavit of Curley Richard") [doc. # 32], Ex. C.  In 1994, as part of a settlement agreement between Mr. Richard and MDC, Mr. Richard was promoted to Superintendent in the Hartford Wastewater Plant.  *Id.* ¶ 20.  Since Mr. Richard became a manager before October 1998, and attests to this characterization of his position, *see id.* ¶ 23, he is ineligible to join the putative Title VII class in this case.  Therefore, the Court will not consider his affidavit in determining whether to grant class certification.

promote African-American [] individuals." *See* Affidavit of Linwood Braswell [doc. #32], Ex. C ("Braswell Affidavit"). Mr. Braswell does not provide any factual allegations of mistreatment that he has suffered on the basis of his race or otherwise.

      **2. Charles Davis**.  Mr. Davis was hired by MDC in 1996 as a CAD Drafter. Like Mr. Braswell's affidavit, Mr. Davis' affidavit contains only generalized information about alleged discrimination experienced by others. Mr. Davis states in his affidavit that he "observed" MDC's failure to hire African-American employees in proportion to the workforce population, that he "observed" the undermining of personal and work reputation of African-American employees by supervisors at MDC, and that he "observed" MDC's failure to promote African-American individuals. Mr. Davis does not provide any specific facts regarding his own treatment by MDC. *See* Affidavit of Charles Davis [doc. #32], Ex. C ("Davis Affidavit").

      **3. Wesley Mitchell**.  Mr. Mitchell has been a Payloader Operator at MDC at the Trash to Energy Plant for about 16 years. Mr. Mitchell, an African-American, alleges, among other things: that supervisors and other employees refer to African-American employees as "monkey" or "gorilla"; that a monkey doll was placed on an African-American employee's desk; that Mr. Mitchell was the only person he is aware of who has ever been demoted at the Trash to Energy Plant; and that he was personally written up for seven consecutive days by a Caucasian supervisor in the week before the supervisor's retirement. Mr. Mitchell states that his reviews have been consistently poor, and that he has "learned from at least one supervisor that when [he] was reviewed and the review was acceptable, it was sent back by either Human Resources or upper supervision and told that they were to make the review worse." Mr. Mitchell also alleges that he did not have access to "mentoring by an African-American employee for determining

10

whether there was any opportunity for promotion" even though the MDC's Affirmative Action Plan allegedly required career development plans and counseling for minority employees on future promotions.  Mr. Mitchell further adds that he has observed an "old boy" system of Caucasian males "being promoted without regard to the capabilities of the individual and a failure to promote African-American employees, and the use of creating records of discipline and poor performance reviews to prevent African-American employees from being eligible candidates for promotion," and that he was denied training in his positions while training was provided almost exclusively to Caucasian employees.  *See* Affidavit of Wesley Mitchell [doc. #32], Ex. C ("Mitchell Affidavit").

    **4.  Keith S. Quildon.**  Mr. Quildon was hired by MDC in November 1999 as a Plant Operator.  In his affidavit, Mr. Quildon states that he "observed" MDC engage in alleged discriminatory conduct involving others, much like the Braswell and Davis affidavits.  In addition, however, Mr. Quildon describes two instances in which he alleges that MDC supervisors discriminated against him personally.  He states that "[f]or nearly a year, I have been overlooked regarding the receiving of my scalehouse operators' license which I have applied for three times.  The original application was submitted at the same time as other co-workers who did receive their license.  Additionally, I trained an employee who received his license nearly a year ago."  Mr. Quildon also asserts that "[m]y supervisor asks co-workers to time my breaks, and regularly undermines and speaks poorly of me and other African-American [] employees."  *See* Affidavit of Keith S. Quildon [doc. #32], Ex. C ("Quildon Affidavit").

    **5.  Monnece F. Ritter**.  Ms. Ritter has worked at MDC as a customer service clerk since about March 1999.  While Ms. Ritter does not state her race or ethnicity in her affidavit, the

Court will assume for the purposes of the class certification motion that she is African-American. Other than the paragraph describing her position and date of hire, Ms. Ritter's affidavit repeats verbatim the same generalized "observations" of alleged mistreatment of others that are set forth in the Braswell, Davis, and Quildon affidavits. Ms. Ritter's affidavit does not recount any instances of alleged discriminatory treatment that she has suffered while employed at MDC. *See* Affidavit of Monnece F. Ritter [doc. #32], Ex. C ("Ritter Affidavit").

**6. Keith Slaughter.** Mr. Slaughter was hired as a Plant Operator by the MDC in 1988. In his affidavit, Mr. Slaughter does not indicate his race or ethnicity, but, once again, the Court will assume for the purposes of this motion that he is African-American. Mr. Slaughter's affidavit contains the identical, *word-for-word* "observations" of Mr. Braswell, Mr. Davis, Mr. Quildon, and Ms. Ritter, with the exception of the following additional comment: "I have observed the assignment of work in my area where African-American employees were signed out and given more difficult physical labor." *See* Affidavit of Keith Slaughter [doc. # 32], Ex. C ("Slaughter Affidavit"). Once again, Mr. Slaughter does not allege any instances in which he suffered discriminatory treatment while employed at MDC.

**7. Jennifer Taylor**. Ms. Taylor, an African-American, is no longer employed by MDC. Ms. Taylor's affidavit does not state when she was hired by MDC or the position she held while an employee of MDC. Ms. Taylor's affidavit largely consists of general observations regarding alleged treatment of African-Americans at MDC rather than recounting any specific personal experiences of discrimination. The following are some examples:

    a.    During my employment with the MDC, I have observed African-American/black and minority employees more commonly given poor performance evaluations than Caucasian employees.

12

b.    I have observed the failure of the MDC to hire African-American/black and minority employees consistent with the workforce population.

c.    I have observed the undermining of personal and work reputation of African-American/black and minority individuals by the MDC.

d.    I have observed the failure of the MDC to promote African-Americans/black and minority individuals.

e.    I have observed a hostile/racially charged work environment against African-American/black and minority employees.

f.    I have observed the harassment and threatening of African-American/black and minority employees.

g.    During my employment with the MDC, I have observed African-American/black more commonly reprimanded and receiving more severe forms of discipline than Caucasian employees.

Affidavit of Jennifer Taylor [doc. #32], Ex. C ("Taylor Affidavit").

Ms. Taylor claims that a Caucasian employee yelled racial epithets at Ms. Taylor loudly enough for most in the Department to hear, but that no disciplinary measures were taken against the employee by supervisors or managers. Ms. Taylor also alleges that during a computer software installation, she was required to work late many evenings while she was experiencing a high-risk pregnancy. Following the software installation, both Ms. Taylor and a Caucasian employee were given low performance reviews with respect to getting along with co-workers. The Caucasian employee allegedly complained to management about the negative evaluation and was able to convince management to change her review to satisfactory. Management did not, however, change Ms. Taylor's negative review. Ms. Taylor further claims that she was excluded from many meetings in connection with the software installation because her supervisor allegedly did not want the Caucasian employees to be upset that Ms. Taylor, an African-American, had been given a leadership role in the implementation of the software. Ms. Taylor asserts she left MDC due to the stress caused by the alleged racial treatment and her fear that it would affect her pregnancy. When she later applied to return to her former position at MDC, she was denied the

position.  *See* Taylor Affidavit.

**8.  Robert J. Weatherly, III.**  Mr. Weatherly was hired as an MDC employee in the Sewer Department in 1976.  Mr. Weatherly does not indicate his race or ethnicity in his affidavit, but the Court will assume for the purposes of this motion that Mr. Weatherly is African-American.  He states in his affidavit that he was denied job reclassification even though he claims he was doing work exceeding his job description.  Although Mr. Weatherly does not specify a date, he claims that "several years later," when his request for reclassification was granted, he was not awarded retroactive pay, even though there have allegedly been several instances at MDC when Caucasian employees who receive reclassification and retroactive pay was automatically given to them.

Mr. Weatherly further states that "I worked in the Mapping area for 12 years and posted for a position within the Department which was one step above the position I held at that time."  Mr. Weatherly was informed that he was unqualified for the position in the Mapping area, even though he asserts that he received good evaluations in the job he held at the time and that the job he held met most of the requirements of the posted position.  After filing a grievance with his Union regarding the failure to promote him, Mr. Weatherly was granted the position.  Upon his promotion, MDC personnel recommended that Mr. Weatherly pursue the District Educational Reimbursement Program, but that he would have to cover the expenses himself and attend classes after work hours.  Mr. Weatherly alleges that MDC covered the costs of the program for several of his Caucasian co-workers and that MDC also allowed them to attend their classes during work hours.  *See* Affidavit of Robert J. Weatherly, III [doc. #32], Ex. C ("Weatherly Affidavit").

14

9. **Douglas Woods.**  Mr. Woods was hired by MDC in 1984 as a Plant Operator.  Like the Braswell, Davis, Quildon, Slaughter, and Ritter affidavits, Mr. Woods' affidavit consists entirely of the same generalized statements of his "observations" of alleged racial discrimination of others by MDC personnel.  The affidavit does not describe any specific instances of racial discrimination that either he or anyone else at MDC suffered.  *See* Affidavit of Douglas Woods [doc. #32], Ex. C ("Douglas Woods Affidavit").

10. **Ronald Woods.**  Mr. Woods, an Affrican-American, was hired by MDC in February 2000 as an Equipment Operator working in the Sewer Department.  In addition to the same broadly worded observations that other affiants have recited, Mr. Woods claims that his first application for transfer to the Trash to Energy Plant never reached the Human Resources Department.  The second time open positions at the Trash to Energy Plant were posted, Mr. Woods hand-delivered his application to the Human Resources Department.  He was then granted a transfer to the Trash to Energy Plant, although three individuals were also hired from outside MDC and were given positions senior to Mr. Woods.  Mr. Woods also asserts that a Caucasian supervisor placed Mr. Woods, but not Caucasian employees, in situations that jeopardized his safety and that on one occasion, while Mr. Woods was out on authorized sick leave, his Caucasian supervisor threatened that if Mr. Woods would be fired if he did not come into work.  *See* Affidavit of Ronald Woods [doc. #32], Ex. C ("Ronald Woods Affidavit").

## II.

Pattern-or-practice disparate treatment claims, such as those that Plaintiffs assert, "focus on allegations of widespread acts of intentional discrimination against individuals.  To succeed

15

on a pattern-or-practice claim, plaintiffs must prove more than sporadic acts of discrimination; rather, they must establish that intentional discrimination was the defendant's standard operating procedure.'" *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)).

A pattern-or-practice suit is generally divided into two phases: liability and remedial.  "At the liability stage, the plaintiffs must produce sufficient evidence to establish a *prima facie* case of a policy, pattern, or practice of intentional discrimination against the protected group. Plaintiffs have typically depended upon two kinds of circumstantial evidence to establish the existence of a policy, pattern, or practice of intentional discrimination: (1) statistical evidence aimed at establishing the defendant's past treatment of the protected group, and (2) testimony from protected class members detailing specific instances of discrimination." *Id.* (citations omitted).

If the plaintiffs in a pattern-or-practice suit satisfy this *prima facie* requirement, the burden of production then shifts to the employer to demonstrate that the plaintiffs' proof "is either inaccurate or insignificant." *Id.* at 159 (citation omitted).  Once the employer produces evidence sufficient to satisfy its burden of production, the trier of fact must then consider the evidence introduced by both sides to determine whether the plaintiffs have established by a preponderance of the evidence that the employer engaged in a pattern or practice of intentional discrimination. *Id.*

If the plaintiffs prove a pattern or practice of discrimination, the court may grant class-wide injunctive relief. *Id.* (citations omitted).  However, if individual relief such as back pay, front pay, or compensatory recovery is sought in addition to class-wide injunctive relief, the court

16

must conduct a "remedial" phase.  In this second phase, class members receive a presumption in their favor "that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." *Id.*

## III.

Rule 23 of the Federal Rules of Civil Procedure governs class certification.  It establishes a two-step analysis for analyzing the propriety of class certification.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  Plaintiffs bears the burden of demonstrating that the proposed class meets the requirements of Rule 23.  *Id*.  First, Plaintiffs must satisfy the four requirements set forth in Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see also In re VISA Check/Mastermoney*, 280 F.3d 124, 133 (2d Cir. 2001).  Second, Plaintiffs must show that the proposed class qualifies under at least one of the subsections of Rule 23(b).  *Id.* at 133; *see Amchem*, 521 U.S. at 614.

In determining whether class treatment is warranted, a court must assume the truth of the allegations of the complaint.  *See Shelter Realty Corp. v. Allied Maint. Corp.*, 574 F.2d 656, 661 n. 15 (2d Cir. 1978); *see also Karen L. v. Physicians Health Servs., Inc.*, 202 F.R.D. 94, 99 (D. Conn. 2001).  In addition, the Second Circuit has cautioned, that "[a]lthough a trial court must

17

conduct a 'rigorous analysis' to ensure that the prerequisites of Rule 23 have been satisfied before

certifying a class, 'a motion for class certification is not an occasion for examination of the merits

of the case.'" *In re VISA Check/Mastermoney*, 280 F.3d at 134-35 (quoting *Caridad v. Metro-*

*North Commuter R.R.*, 191 F.3d 282, 291 (2d Cir. 1999)).  Nevertheless, a court may go beyond

the pleadings, at least to a certain extent.  That is, "'[i]n making a certification decision, a judge

must look somewhere between the pleading[s] and the fruits of discovery . . .'" *In re Philip*

*Morris Inc.*, 214 F.3d 132, 135 (2d Cir. 2000) (quoting *Sirota v. Solitron Devices, Inc.*, 673 F.2d

566, 571 (2d Cir. 1982)); *see also Karen L.*, 202 F.R.D. at 99 ("[A] court may consider certain

material in addition to the pleadings in determining whether class certification is appropriate.").

Therefore, the issue before this Court is whether, based upon the record, Plaintiffs have

satisfied their burden of showing that each of the Rule 23(a) requirements has been met and that

the action is maintainable under one of the subdivisions of Rule 23(b).  *See Krueger v. New York*

*Tel. Co.*, 163 F.R.D. 433, 438 (S.D.N.Y. 1995).

### A.  Rule 23(a)

Under Rule 23(a)(1), the class must be "so numerous that joinder of all members is

impracticable." Fed. R. Civ. P. 23(a)(1); *see Amchem*, 521 U.S. at 607 n. 8; *see also Marisol A.*

*v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (*per curiam*).  The Court will assume for the

purposes of this motion that Plaintiffs have met the numerosity requirement, and will instead

focus on the elements that are more problematic for Plaintiffs – commonality, typicality, and

adequacy of representation.[6]

_____

[6] MDC contends that Plaintiffs fail to satisfy the numerosity requirement because
Plaintiffs' sample list of potential class members, *see* doc. #32, Ex. A-1, is allegedly riddled with
errors.  Obj. to Mot. for Class Cert. at 16.  The Court need not determine whether numerosity has

The commonality and typicality requirements of Rule 23(a) "'tend to merge' because 'both serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.'" *Caridad*, 191 F.3d at 281 (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)). Furthermore, the commonality and typicality requirements "also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest." *Falcon*, 457 U.S. at 157 n.13. Accordingly, and because it is particularly appropriate in the circumstances of the present case, the Court will collectively discuss the commonality, typicality, and adequacy of representation elements.

While not disputing that "racial discrimination is by definition class discrimination," the Supreme Court has held that "the allegation that such discrimination has occurred neither determines whether a class action may be maintained in accordance with Rule 23 nor defines the class that may be certified." *Falcon*, 457 U.S. at 157. Thus, in *Falcon*, the Supreme Court rejected the Fifth Circuit's "across-the-board" rule, which permitted "an employee complaining of one employment practice to represent another complaining of another practice, if the plaintiff and the members of the class suffer from essentially the same injury." *Id.* at 153; *see Falcon v. Gen. Tel. Co.*, 626 F.2d 369, 375 (5th Cir. 1980). The Court observed that:

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share

---

been met because the Court's decision on certification in this case does not turn on numerosity.

> common questions of law or fact and that the individual's claim will be typical of
> the class claims. For respondent to bridge that gap, he must prove much more
> than the validity of his own claim.

*Falcon*, 457 U.S. at 157-58.

The reasoning and observations of the Supreme Court in *Falcon* are especially germane

to the present case, for in *Falcon*, as here, the principal issue was not whether the named

plaintiffs had evidence to support an individual claim of racial discrimination – for example, a

claim of discrimination in promotion decisions – but rather whether a court could infer from the

plaintiff's individual claim "(1) that this discriminatory treatment is typical of [the employer's]

promotion practices, (2) that [the employer's] promotion practices are motivated by a policy of []

discrimination that pervades [the workplace], or (3) that this policy of [] discrimination is

reflected in [the employer's] other employment practices, such as hiring, in the same way it is

manifested in the promotion practices. These additional inferences demonstrate the tenuous

character of any presumption that the class claims are 'fairly encompassed' within [plaintiff's]

claim." *Id.* at 158.

The critical inquiry, for this Court, then, in deciding whether a class action is justified

centers on the evidence and allegations Plaintiffs have submitted in support of their position that

their grievances are typical of those in their putative class and that their individual reports of

discrimination are fairly traceable to a common policy or general practice of racial discrimination

that pervades MDC's workplace. *See Hartman v. Duffey*, 19 F.3d 1459, 1473 (D.C. Cir. 1994)

("While in a case alleging intentional discrimination . . . a plaintiff need not isolate the particular

practice and prove that such practice *caused* the discrimination, plaintiffs must make a significant

showing to permit the court to infer that members of the class suffered from a common policy of

20

discrimination that pervaded all of the employer's challenged employment decisions.")

(emphasis in original). In making that inquiry, the Court must bear in mind the broad class

Plaintiffs seek to certify:

> All African-American persons employed by MDC in non-managerial positions at
> any time from October 1998 to the present, who are or were subject to the MDC's
> employment and human resources policies and practices, including, but not
> limited to, current and former employees.

Plaintiffs can discharge their obligation to demonstrate the existence of a common and

pervasive policy of discrimination in two ways – through statistical evidence and anecdotal

evidence. *Robinson*, 267 F.3d at 158. While the Second Circuit has not established a bright-line

rule that requires plaintiffs seeking class certification in pattern-or-practice discrimination cases

to present statistical evidence in order to satisfy the typicality and commonality elements of Rule

23(a), that court has observed that "[t]he heavy reliance on statistical evidence in a pattern-or-

practice disparate treatment claim distinguishes such a claim from an individual disparate

treatment claim proceeding under the *McDonnell Douglas* framework." *Robinson*, 267 F.3d at

158 (citing *Bell v. EPA*, 232 F.3d 546, 553 (7th Cir. 2000)) ("In a pattern and practice disparate

treatment case, statistical evidence constitutes the core of a plaintiff's *prima facie* case. Within

the *McDonnell Douglas* individual disparate treatment model, however, statistical evidence is

only one small part of a substantial web of evidence indicating pretext.").

Statistical evidence would have been extremely useful, if not indispensable, in a case such

as this involving allegations of pattern-or-practice racial discrimination. Indeed, the Court has

not been directed to nor has it found an instance in which a court certified a Title VII disparate

treatment class in the absence of statistical evidence. In fact, Plaintiffs themselves recognized at

21

the inception of this case that statistical evidence would be highly relevant to their request for class certification.  For example, the Complaint asserts that some of the common questions that bind the proposed class members include:

> c.  Whether there are *statistically significant disparities* between the evaluation scores of African-American employees and the evaluation scores of Caucasian employees, sufficient to permit an inference of intentional discrimination;

> e.  Whether there are *statistically significant disparities* between the compensation awarded to African-American employees and the compensation awarded to similarly situated Caucasian employees, sufficient to permit an inference of intentional discrimination;

> h.  Whether there are *statistically significant disparities* between the promotions awarded to African-American employees and the promotions awarded to similarly-situated Caucasian employees, and whether pay practices including retroactive pay practices show *statistically significant disparities* between classes of employees sufficient to permit an inference of intentional discrimination.

Compl. at 9-10 (emphasis added).

Yet, nearly three years after the filing of this case, the named Plaintiffs have not produced a single statistic, let alone the statistics, that would support the allegations of their Complaint.  At oral argument, Plaintiffs asserted that they would present statistical evidence to support their claims of pattern or practice discrimination only *after* the Court certified the proposed class. This assertion is curious to say the least.  After all, it is Plaintiffs who bear the burden of satisfying the elements of Fed. R. Civ. P. 23, *see Amchem*, 521 U.S. at 614, and the Court granted Plaintiffs considerable time and numerous extensions to the case management schedule for the precise purpose of allowing Plaintiffs to conduct the discovery they claimed they needed to support their class certification motion.  Now, more than two years after discovery began and long after the discovery period in this case closed, Plaintiffs contend that only after the Court

22

certifies the class, will Plaintiffs produce statistics to show that the discrimination experienced by the named Plaintiffs was also experienced by other members of the putative class pursuant to MDC's alleged discriminatory practices and policies.

The Court rejects the named Plaintiffs' attempt to delay (once again) the day of reckoning on their assertion that statistical evidence supports their claims. If they had any statistical evidence to support their claims, they were required to produce it at the time they filed their motion for class certification.

There are two possible explanations for the glaring absence of any statistical evidence, both of which undermine the named Plaintiffs' request for class certification. First, it is possible that statistical evidence on MDC's practices would rebut Plaintiffs' claim that MDC engaged in a common and pervasive practice of discrimination against African-American, non-managerial employees. In the alternative, statistical evidence may well have shown a pattern or practice of discrimination at MDC, but the named Plaintiffs, and their counsel, have simply not bothered to collect it or produce it after more than two years of discovery against MDC. If it is the former, the named Plaintiffs surely cannot establish commonality and typicality; if it is the latter, the named Plaintiffs and their counsel have demonstrated that they cannot adequately represent the class. Either way, the absence of statistical evidence speaks volumes, though the Court recognizes that the absence is not determinative of Plaintiffs' motion.

In the absence of statistical evidence, Plaintiffs rely exclusively on anecdotal evidence in the form of affidavits submitted by current and former employees of MDC. Plaintiffs' reliance solely on anecdotal evidence from a diversely situated handful of MDC employees makes their task of demonstrating commonality and typicality quite difficult. *See Krueger v. New York Tel.*

23

*Co.*, 163 F.R.D. 433, 441 (S.D.N.Y. 1995) (court certified class because statistical evidence tied plaintiffs' anecdotal evidence together and demonstrated that they were all affected by a company-wide practice and policy of discrimination).  This is because without statistical evidence, it appears to this Court from the affidavits submitted that this is a case where individual class members assert an assortment of separate claims based on differing legal theories and, to the extent the class members assert similar legal claims, they are based on assorted and unrelated company actions, over a long period, in various locations, and in an uncoordinated manner. *See id.*

Plaintiffs' varied and multi-faceted allegations of discriminatory conduct are scattered among several sources, including the Complaint, the affidavits, and oral argument.  When pressed at argument to identify common issues, counsel for the named Plaintiffs' identified three alleged practices at MDC that they argue are common to the proposed class.  First, Plaintiffs allege that MDC often allows a Caucasian, but not an African-American applicant, for a job opening to fill the position in an acting capacity role before assuming full status, thereby relieving the Caucasian, but not the African-American, applicant of the need to apply for posted jobs and compete with other qualified applicants.  Second, Plaintiffs allege that African-American employees at MDC commonly receive average or below-average performance ratings, while Caucasian employees are more likely to receive average or above-average ratings.  Third, Plaintiffs assert that African-American employees are typically denied retroactive pay when their positions are reclassified to a higher salary level, while Caucasian employees typically are awarded retroactive pay in those circumstances.

Despite Plaintiffs' efforts to distill their varied claims into three common issues for the

Court, it is apparent that not all of the named Plaintiffs and putative class members assert claims

that correspond to these three issues, and that those who do assert such claims also proffer

allegations and claims that extend far beyond the scope of the three issues identified as common

to the class.  A few examples from the Complaint and affidavits will suffice to make the point.

For example, Ms. Whaley alleges that she was subjected to discrimination in promotions and

compensation.  *Id.* ¶ 8.  Ms. Hewitt asserts that she experienced discrimination in performance

evaluations and promotions, and also asserts claims of retaliation, limitations on training

opportunities, and discrimination in compensation.  Compl. at ¶ 7.  Mr. Mitchell alleges that he

was given negative performance evaluations and was denied mentoring on the basis of his race,

but also asserts claims of hostile work environment and discriminatory demotions and discipline.

Mitchell Affidavit at ¶ 4.  Mr. Davis, on the other hand, while not making any specific factual

allegations, claims MDC undermines the reputation of African-American employees.  Davis

Affidavit ¶ 4.  Mr. Slaughter claims that African-Americans in his work area are given more

difficult labor than Caucasians and MDC harms the reputations of African-American employees

because of their race.  Slaughter Affidavit ¶ 4.  Furthermore, some of the affiants simply repeat

identical, generalized claims of discrimination without any specifics whatsoever.  *See e.g.*, Ritter

Affidavit ¶ 4; Braswell Affidavit ¶ 4.

The putative class members also vary greatly in terms of their departments, supervisors,

the number of years they have been employed by MDC, and their individual circumstances.

Thus, while most, though not all, of the named Plaintiffs and affiants allege discrimination in

promotions, there is little to bind their claims together into a common practice and policy.  In

fact, several courts have declined to find commonality and typicality when a proposed class

25

includes former employees such as Ms. Hewitt and Ms. Taylor.  *See Bacon v. Honda of Am.*

*Mfg., Inc.*, 205 F.R.D. 466, 482 (S.D.Ohio 2001) ("Courts have declined to certify classes

consisting of both former and present employees on the basis that commonality and typicality are

lacking.") (citations omitted).

       A further obstacle to establishing typicality in this case is the multiple locations of the

potential class members' departments.  The various departments at MDC that are implicated by

Plaintiffs' allegations include, among others, the following departments and locations: Human

Resources, Information Systems, Operations, Facility Operations and Maintenance, Finance,

Environmental Health and Safety, Water Treatment and Supply, and Engineering and Planning;

with locations in Hartford, East Hartford, Poquonock, Rocky Hill, Bloomfield, Ellington,

Torrington, Essex, and Watertown.  *See* MDC Organization Charts 2003 [doc. # 35], Ex. A-1.

Given the wide range of departments, supervisors, dates of employment, and qualifications of the

individuals who allegedly experienced some form of employment discrimination, the claims of

the individual affiants do not illustrate commonality or typicality among the employees and

would, consequently, elicit highly individualized defenses by MDC with respect to each plaintiff.

 In effect, "[t]he factfinder will have to consider each of the named plaintiffs' claims on a case-

by-case basis along with" any unique defenses MDC will raise to each plaintiff.  *Webb v. Merck*

*& Co., Inc.*, 206 F.R.D. 399, 405-06 (E.D.Pa. 2002).  Courts have declined to certify Title VII

disparate treatment classes in similar situations.  *See Carson v. Giant Food, Inc.,*187 F. Supp. 2d

462, 471 (D.Md. 2002) ("[P]utative class members worked in at least thirteen different facilities,

located at five different towns or cities.  This geographical diversity itself would make class

treatment inappropriate."); *see also Bacon,* 205 F.R.D. at 478-79 ("In light of the number of

departments involved, the autonomy of those departments, the number of decisionmakers

involved, and the diverse job functions and qualifications of those departments, the plaintiffs

have not established that proof of any one class member's claim of disparate treatment will

involve a common issue the resolution of which will advance the litigation.") (citation omitted);

*Reyes v. Walt Disney World Co.*, 176 F.R.D. 654, 658 (M.D.Fla. 1998) (denying class action

brought by employees, in part based on the employees' employment in different departments

under individualized circumstances and the attendant failure to show commonality and typicality,

and the risk of unmanageability).

Plaintiffs in this case have attempted to create the impression of a cohesive class by

submitting discrete stories of fact-intensive – when factual allegations are offered – grievances

that manage only to set forth what are essentially individual claims of employment

discrimination.  A request for class treatment demands more than this, and obligates Plaintiffs to

bridge the conceptual gap between their individual allegations of discrimination and "the

existence of a class of persons who have suffered the same injury as that individual, such that the

individual's claim and the class claims will share common questions of law or fact and that the

individual's claim will be typical of the class claims.  For [plaintiffs] to bridge that gap, [they]

must prove much more than the validity of [their] own claim[s]." *Falcon*, 457 U.S. at 157-58.

After years of discovery, the named Plaintiffs have failed to come forth with sufficient evidence

to bridge that gap, and given the otherwise lean evidentiary record in this case, the Court cannot

presume the existence of a widespread pattern-or-practice of racial discrimination against

African-Americans that would be appropriate for class action treatment.[7]  Indeed, "[t]he primary

thrust of *Falcon* was that satisfaction of Rule 23(a) requirements may not be *presumed*."  *Rossini*

*v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986) (emphasis in original); *see*

*Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1570 (11th Cir. 1992)

(upholding district court's denial of class certification because "[w]ithout specific questions of

law or fact common to plaintiffs and the members of the class they seek to represent, the district

court cannot presume plaintiffs' claims are typical of other claims against [the employer's] black

employees and applicants.").

    It is apparent, therefore, that if the Court were to certify the Plaintiffs' disparate treatment

claims, the Court "would be grouping together many unrelated employment decisions made by

many individual supervisors against many individual plaintiffs.  An analysis of these unrelated

decisions would raise numerous individualized questions that are not amenable to generalized

proof."  *Reap v. Cont'l Casualty Co.*, 199 F.R.D. 536, 545 (D.N.J. 2001).  Class certification is

not appropriate in such circumstances.  *See Pruitt v. City of Chicago, Dep't of Aviation*, No. 03C

2877, 2004 WL 1146110, at \*9 (N.D. Ill. May 20, 2004) (denying motion for Title VII class

certification for failure to establish commonality and typicality due to numerous individual

---

    [7] The parties submitted a Compliance Audit of Employment Practices of the Metropolitan District Commission Undertaken by Legal Counsel, Levy & Droney, P.C. dated March 15, 2002 [doc. # 32], Ex. D ("Levy & Droney Report").  The audit was conducted at the request of MDC following complaints by employees of race discrimination and retaliation, as well as an adverse decision by the United States District Court in *Harper v. Metropolitan District Commission*, 03:96cv2171 (AVC), and October 2001 articles in *The Hartford Courant* critical of MDC's alleged discriminatory employment practices.  A Blue Ribbon Committee was formed to review compliance with state and federal law, and submitted written findings and recommendations.  In any case, the audit contains information that is both beneficial and deleterious to both parties and is inconclusive on whether a policy of discrimination existed at MDC.

claims involving distinct content, time, and setting); *see also Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619, 676 (N.D. Ga. 2003) (class certification inappropriate because proposed plaintiffs alleged misconduct within each individual's department to which defendant would likely offer a specific defense, and result in highly specific factual inquiries); *Wright v. Circuit City Stores, Inc.*, 201 F.R.D. 526, 541 (N.D. Ala. 2001) ("[T]he court is of the opinion that the purported class is comprised of a large group of diverse and differently situated employees whose highly individualized claims of discrimination do not lend themselves to class-wide proof."); *Bostron v. Apfel*, 182 F.R.D. 188, 196 (D.Md. 1998) (broad conclusory allegations of widespread discrimination along with a "jumble of numbers" were insufficient to satisfy commonality and typicality); *Lumpkin v. E.I. Du Pont de Nemours & Co.*, 161 F.R.D. 480, 482 (M.D. Ga. 1995) (concluding that the discrete and individualized nature of plaintiffs' claims and evidence – including different departments, different supervisors, and different shifts – were not susceptible to generalized proofs or defenses and, therefore, failed to demonstrate commonality and typicality).

Plaintiffs offer a final basis on which to find commonality and typicality among the putative class members that does not rely on individual claims. Plaintiffs submit that MDC's alleged failure to abide by federal affirmative action policies is an issue common to all Plaintiffs. Mem. in Supp. of Class Cert. at 6. The Court disagrees. Plaintiffs argue that they "can demonstrate that the MDC does receive in excess of $50,000 per year in grants from the federal government, and, therefore, the MDC should be required to be in compliance with affirmative action obligations created under federal law." *Id.* at 6-7. However, nowhere in their pleadings do Plaintiffs identify the federal statute MDC allegedly violated or the basis for the alleged

$50,000 MDC supposedly receives in federal funds. This omission cannot be attributed to inadequate opportunity to conduct the necessary discovery. After nearly two years of discovery, surely minimal diligence on the part of counsel would have yielded more concrete information to present to the Court. The Court emphasizes that Plaintiffs' failure to produce a critical piece of evidence – the federal law that MDC is alleged to have violated – does not, and cannot, alone defeat commonality. However, without a citation to the statute that ostensibly bound MDC with respect to the putative class, or specific indication of any other provision under which MDC accepted conditional federal funds, the Court is left to surmise what common question, if any, exists – aside from the bold, vague, and conclusory assertion that MDC violated some federal law. The onus is squarely on Plaintiffs to demonstrate the existence of a common question. "The plaintiff cannot rely solely on the allegations of the complaint, but must provide sufficient information on which the court can make a determination." *Petrolito v. Arrow Finan. Servs., LLC*, 221 F.R.D. 303, 307 (D. Conn. 2004); *see Pecere v. Empire Blue Cross and Blue Shield*, 194 F.R.D. 66, 69 (E.D.N.Y. 2000) ("'[c]ertification . . . is dependant on [the plaintiff's] proof that each of the requirements of Rule 23(a) . . . has been met.'") (quoting *Lloyd v. Indus. Bio-Test Lab, Inc.*, 454 F. Supp. 807, 811-12 (S.D.N.Y. 1978)). Plaintiffs have not done so.

The lack of support for a finding of commonality and typicality also undermines the adequacy of the named Plaintiffs and their class counsel to represent the members of the class. "[W]here there are particularly unique fact patterns, employment circumstances, or defenses with respect to a named plaintiff, the claims of the plaintiff may not be typical of the class, and he or she may be an inappropriate class representative." *Bishop v. New York Dept. of Housing Pres. and Dev.*, 141 F.R.D. 229, 238 (S.D.N.Y. 1992); *see Falcon*, 457 U.S. at 157 ("[T]he 'mere fact

30

that a complaint alleges racial or ethnic discrimination does not in itself ensure that the party who brought the lawsuit will be an adequate representative of those who may have been the real victims of that discrimination.'" (quoting *East Texas Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 405-06 (1977)); *see also Hartman*, 19 F.3d at 1472 ("[T]he record does not adequately demonstrate either that a class exists or that the named plaintiffs are the proper representatives of that class."); *Webb*, 206 F.R.D. at 408 (finding that plaintiffs would not adequately represent the interests of class members because plaintiffs failed to demonstrate that their claims were common to and typical of the class).

"In a motion for class certification, the plaintiff bears the 'obligat[ion] to show, in at least a preliminary fashion, the required commonality between her claims and those of the putative class.'" *Hartman*, 19 F.3d at 1472 (quoting *Nelson v. United States Steel Corp.*, 709 F.2d 675, 680 (11th Cir. 1983)). After two years of discovery devoted to individual and class claims, the named Plaintiffs in this case have not made such a preliminary showing – either of commonality, typicality, or adequacy of representation – and thus they have not discharged their obligation to satisfy the requirements of Rule 23(a).

## B.  Rule 23(b)

In addition to satisfying each of the requirements of Rule 23(a), a plaintiff seeking class action status must also show that the proposed class qualifies under at least one of the subsections of Rule 23(b). *See Amchem*, 521 U.S. at 614. In this action, Plaintiffs seek certification under either Rule 23(b)(2) or (b)(3).[8] However, even assuming *arguendo* that the

---

[8] Plaintiffs expressed their interest in certification under Rule 23(b)(1)(A) for the first time in the brief in support of their motion for class certification on the ground that MDC could face incompatible duties if numerous individual suits yielded conflicting results. Mem. in Supp.

putative class in this case satisfied the commonality, typicality, and adequacy of representation requirements of Rule 23(a), the Court is not convinced that Plaintiffs have satisfied the requirements of either Rule 23(b)(2) or 23(b)(3).  After careful consideration of the record and the parties' contentions at oral argument, the Court finds, for the purposes of Rule 23(b)(2), that the monetary relief sought by the putative class predominates over any injunctive relief.  For the purposes of Rule 23(b)(3), the Court finds that common questions and facts do not predominate over the individual class members and that a class action is not the superior vehicle for the fair and efficient adjudication of the controversy.

1.  **Rule 23(b)(2)**.  Class certification under Rule 23(b)(2) can be maintained if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2); *see VISA Check/Mastermoney*, 280 F.3d at 133.  "Generally, when monetary relief is requested in tandem with injunctive and declaratory relief, the court must determine whether the requested monetary relief predominates over the claims for equitable relief."  *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 19 (2d Cir. 2003).

As the Court has explained, there is insufficient evidence that MDC acted or refused to act in a general pattern or practice with regard to the proposed class in this case.  More importantly, with respect to Rule 23(b)(2), the Second Circuit held in *Robinson* that when plaintiffs seeking certification under Rule 23(b)(2) request both injunctive relief and non-

_____

of Class Cert. at 14.  Plaintiffs' Complaint did not include a request for Rule 23(b)(1) certification, while it did explicitly urge Rule 23(b)(2) or (b)(3) certification.  Compl. ¶ 14. Accordingly, Plaintiffs request for Rule 23(b)(1) class certification is untimely, and is therefore denied.

incidental monetary damages, the district court must "consider [] the evidence presented at a class certification hearing and the arguments of counsel, and then assess whether (b)(2) certification is appropriate in light of the relative importance of the remedies sought, given all of the facts and circumstances of the case." *Robinson*, 267 F.3d at 164. "The district court may allow (b)(2) certification if it finds in its informed sound judicial discretion, that (1) the positive weight or value [to the plaintiffs] of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed, and (2) class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy." *Id.*

The Second Circuit has explained that "[a]lthough the assessment of whether injunctive or declaratory relief predominates will require an *ad hoc* balancing that will vary from case to case, before allowing (b)(2) certification a district court should, at a minimum, satisfy itself of the following: (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Robinson*, 267 F.3d at 164.

In their Complaint, Plaintiffs request the following relief: (1) declaratory judgment that MDC's acts and practices are in violation of the laws of the United States; (2) enjoin MDC to hire an experienced, independent Employee Ombudsman to investigate and raise issues of employment mistreatment; (3) require MDC to post jobs before hiring; (4) require that the Affirmative Action Officer not share his duties as a Personnel Department employee; (5) award Plaintiffs and Class members lost wages, including back pay, front pay, job grade evaluations and lost fringe benefits, including any lost benefits that would otherwise have been included in the

33

401(k) pension plan; and (6) compensatory and punitive damages.  Compl. at 15.

The named Plaintiffs, having brought this case on behalf of themselves as well as the proposed class, have stated that they will pursue their case even in the absence of class certification.  For the purposes of Rule 23(b)(2), however, the critical issue regarding the named Plaintiffs and the putative class members is whether reasonable plaintiffs would pursue this case if monetary recovery would not be awarded.  The Court does not believe they would for several reasons.  First, the proposed class contemplates former employees, including Ms. Hewitt and Ms. Taylor.  It is difficult to see how these former employees could meaningfully benefit from the declaratory relief Plaintiffs seek.  In fact, Plaintiffs conceded at oral argument that declaratory and injunctive relief is more appropriate for the present employees looking into the future to prevent future harm and not former employees.  For former employees, their incentive to join the class is monetary relief.

In addition, any injunctive relief that could be granted to the class can be obtained by the named Plaintiffs in their pending suit.  This would enhance efficiency by averting a potentially overwhelming and highly individualized damages phase that would threaten to convert the ostensibly unified class action into a series of mini-trials, thus defeating the likelihood that "class treatment would be efficient and manageable [and would] thereby achiev[e] an appreciable measure of judicial economy."  *Robinson*, 267 F.3d at 164.  More fundamentally, of course, Plaintiffs have not established that "the positive weight or value [to the class] of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed."  *Id.*  For the foregoing reasons, the Plaintiffs' motion for certification pursuant to Rule 23(b)(2) is denied.

**2. Rule 23(b)(3)**.   Rule 23(b)(3) permits class certification if the court finds that the questions of law or fact common to the members of the class predominate or fact common to the members of class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); *see VISA Check/Mastermoney*, 280 F.3d at 133.

Under Fed. R. Civ. P. 23(b), the "[f]actors relevant to superiority of a class action under Rule 23(b)(3) include":

> (A) the interest of the members of the class in individually controlling the
> prosecution or defense of separate actions; (B) the extent and nature of any
> litigation concerning the controversy already commenced by or against members
> of the class; (C) the desirability or undesirability of concentrating the litigation of
> the claims in the particular forum; and (D) the difficulties likely to be encountered
> in the management of a class action.

Fed. R. Civ. P. Rule 23(b).   "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *VISA Check/Mastermoney*, 280 F.3d at 136; *Amchem*, 521 U.S. at 623.

"In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *VISA Check/Mastermoney*, 280 F.3d at 136 (citation and quotation marks omitted).   The Court's determination that the proposed class failed to satisfy Rule 23(a)'s requirement of commonality and typicality applies with even greater force to the (b)(3) inquiry. "'The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Moore v. PaineWebber, Inc.*, 306 F.3d

1247, 1252 (2d Cir. 2002) (quoting *Amchem*, 521 U.S. at 623).  "It is a *more demanding* criterion than the commonality inquiry under Rule 23(a)."  *Id.* (emphasis added).  Since Plaintiffs were unable to meet the Rule 23(a) commonality requirement, then *a fortiori*, they fail to satisfy Rule 23(b)(3)'s predominance requirement.

In any event, with Rule 23(b)(3) "the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."  *Amchem* at 617.  The named Plaintiffs are presently pursuing their case before this Court, and it is unlikely that other employees who believe that MDC has intentionally discriminated against them would lack effective strength to file suits against MDC.  In fact, Plaintiffs' counsel at argument asserted that if the Court denied the motion for class action status, several other employees would seek to intervene in this action. In short, a class action is not necessary to permit the employees to pursue their individual claims of discrimination.[9]

---

[9] That class action status is not needed to allow MDC employees to vindicate their rights is evidenced by the number of individual employment discrimination cases against MDC that are or have been pending before the District Court: *Chavez v. Metropolitan District Commission*, No. 3:02cv457 (MRK), *Thomas v. Metropolitan District Commission*, No. 3:02cv458 (MRK); *Richardson v. Metropolitan District Commission*, No. 3:00cv1062 (JCH); *Harper v. Metropolitan District Commission*, No. 3:96cv2171 (AVC); *Janeiro v. Metropolitan District Commission*, No. 3:99cv343 (DJS); and *Smith v. Metropolitan District Commission*, No. 3:99cv1097 (AVC).

### IV.  Conclusion

For the foregoing reasons, the Court DENIES the Motion for Order Determining That Action Proceed as Class Action [doc. #31].  The governing Scheduling Order [doc. # 40] provides Plaintiffs 60 days from the date of this order to join additional parties and amend the pleadings.  Accordingly, Plaintiffs shall have until **August 27, 2004** to join additional parties and amend the Complaint, and Defendants shall have until **September 27, 2004** to join additional parties and to respond to the amended Complaint.  Finally, the parties shall extend the remaining deadlines in the Scheduling Order by 30 days from the date of this decision in accordance with the Court's Order [doc. #44] granting Plaintiff's motion [doc. #43] to extend the deadlines.

IT IS SO ORDERED.

/s/ _____Mark R. Kravitz_____
United States District Judge

Dated at New Haven, Connecticut: June 28, 2004.

37